[Nos. 39333-2-I; 39914-4-I; Division One. March 2, 1998.]
40310-9-I.

KING COUNTY, *Respondent*, v. CENTRAL PUGET SOUND
GROWTH MANAGEMENT HEARINGS BOARD, ET AL.,
*Respondents*, FRIENDS OF THE LAW, *Appellant*, BEAR
CREEK CITIZENS FOR GROWTH MANAGEMENT, ET AL.,
*Respondents*.

FRIENDS OF THE LAW, ET AL., *Appellants*, v. KING COUNTY,
ET AL., *Respondents*.

4

6

*David A. Bricklin* and *Michael W. Gendler* of *Bricklin & Gendler*, for appellants.

*Norm Maleng, Prosecuting Attorney,* and *H. Kevin Wright, Michael J. Sinsky,* and *Charles Maduell, Deputies*; *Richard R. Wilson, Mark C. McPherson,* and *Kristina M. Dalman* of *Hillis, Clark, Martin & Peterson*; and *Katherine K. Laird, Thomas A. Goeltz,* and *Hall Baetz* of *Davis Wright Tremaine,* for respondents.

*Jeffrey M. Eustis*, amicus curiae.

BAKER, C.J. — In the 1990 Growth Management Act (GMA), the state Legislature recognized that uncoordinated and unplanned growth poses a threat to the environment, sustainable economic development, and the health, safety and quality of life. The Act required counties and cities to adopt comprehensive plans which were to be coordinated and consistent with the plans adopted by other counties or cities with which the county or city has common borders or related regional issues, as expressed by the GMA. This requirement is an aspect of comprehensive planning that is integral to the public interest.

In this opinion we address appeals taken from three separate but related trial court rulings. Although separately briefed and argued, these appeals share similar facts and are related to a core of decisions made by King County in its GMA comprehensive plan. Therefore, we consolidate the cases for purposes of this opinion.[1]

In the first case, Friends of the Law (Friends) appeals a trial court order reversing in part a decision of the Central Puget Sound Growth Management Hearings Board (the Board). Given the consistency requirement of the GMA, and the role that county-wide planning policies (CPPs) play in assuring that consistency, we hold that CPPs may

[1]*See* RAP 3.3(b).

constrain a county's otherwise considerable discretion in formulating its comprehensive plan. The CPPs at issue directed King County to include the challenged area in its final Urban Growth Area (UGA) to be designated in its comprehensive plan. Because this is true, we affirm the trial court order reversing the Board and reinstating an earlier Board order reaching the same conclusion.

Friends also appeals the trial court order dismissing its cross-petition. Under the Administrative Procedure Act (APA), a petition for judicial review of an administrative agency's order must be filed with the court within 30 days after service of the final order. Although policy reasons may support creating a different time period for cross-petitions, such a determination must come from the Legislature. We hold that Friends' cross-petition was untimely. Thus we affirm the trial court order dismissing the claims raised by Friends in its cross-petition.

The second case is an appeal by Friends and the Coalition for Public Trust from the trial court order affirming a Finding of Compliance issued by the Board. The Board's finding related to actions taken by the County pursuant to an earlier remand order of the Board. Because we hold that the County was required by the CPPs to include the challenged area in its final Urban Growth Area, we determine that the issue raised in the appeal is moot.

Finally, Friends appeals the trial court order dismissing its Land Use Petition Act (LUPA) petition challenging the project level permits and zoning code amendments for an urban residential development, the Port Blakely project. We hold that the County acted lawfully in approving the project. A Board finding of noncompliance and an order of remand does not affect the validity of a comprehensive plan during the period of remand unless accompanied by a determination of invalidity. The Board made no such determination.

We reject Friends' LUPA challenge to the adequacy of the Environmental Impact Statement (EIS) completed on the project, and hold that the EIS satisfies the applicable rule of reason. We also hold that Friends waived an appear-

ance of fairness challenge it raises to the King County Council's approval of the project. Friends failed to seek recusal of councilmembers it alleged made inadequate disclosures of ex parte communications at the critical juncture in the Council's proceedings, when those councilmembers might have been precluded from participating in the final vote. Once the councilmembers participated in that decision, Friends lost its right to challenge the outcome on appearance of fairness grounds.

## FACTS

The GMA was enacted in 1990.[2] In 1994 the County adopted its GMA comprehensive plan. As required by the GMA, the County's plan designated an Urban Growth Area (UGA).[3] Included in the County's UGA is an area referred to as the Bear Creek Urban Planned Developments (UPDs). The Bear Creek UPDs contain 1506 acres owned by the Quadrant Corporation and 1050 acres owned by Port Blakely Tree Farms. The UPDs are located approximately midway between the City of Redmond and the City of Duvall. Friends appealed to the Board, challenging the County's decision to include the Bear Creek UPDs within the designated UGA.

The Board issued a Final Decision and Order in October 1995, holding that the County's inclusion of the Bear Creek UPDs within the UGA was required by the applicable CPPs. Therefore, the designation complied with the GMA.[4] Friends moved for reconsideration, arguing that the Bear Creek area cannot properly be included in the UGA because it does not meet the criteria for Urban Growth Area designation in the GMA, regardless of the CPPs.

[2]LAWS OF 1990, 1st Ex. Sess., ch. 17.

[3]RCW 36.70A.110(1) (1995). All citations to the GMA will be to the 1995 version of that statute.

[4]The Board noted that if the CPPs had not required the County to include the Bear Creek UPDs in the final UGA, it would have "serious problems" with the designation. One Board member dissented, arguing that CPPs cannot short-cut the process for development of comprehensive plans, particularly with regard to designation of final UGAs.

On reconsideration in December 1995, the Board reversed its earlier decision. It held that the CPPs were internally inconsistent, ambiguous and not directive or binding on the County's exercise of discretion in adopting its final UGA. The Board ruled that the County had not adequately justified its decision to include the contested area in the UGA. The Board remanded to the County with instructions to either delete the Bear Creek UPDs from the UGA, make it a fully contained community if it met the requirements of RCW 36.70A.350, or adequately justify its inclusion in the UGA pursuant to the requirements of RCW 36.70A.110. Despite the remand order, the Board declined to issue an order invalidating the UGA designation in the County's comprehensive plan. The County was ordered to file a statement of actions taken to comply by March 1996.

The County petitioned in superior court for review of the Board's determinations that (1) the CPPs did not direct inclusion of the Bear Creek UPDs within the County's UGA, and (2) the County failed to otherwise adequately justify inclusion of these lands within the UGA.

The superior court reversed the Board, in part. The court concluded that the Board's order on reconsideration was based on an erroneous interpretation of the County's CPPs. The court ruled that the CPPs directed the County to include the Bear Creek UPDs sites within the UGA in the County's 1994 plan. The court therefore reinstated that portion of the Board's prior order that had so stated. The court did not address the second issue raised by the County in its petition for review. Friends' appeal of the trial court's decision is the first of the companion appeals that will be addressed in this opinion.

In addition to appealing to the superior court, the County took actions on remand as directed by the Board's order. Friends challenged the adequacy of those actions, arguing that the County violated the GMA. In a May 1996 Finding of Compliance the Board held that the County had procedurally complied with its order, and that it would not consider whether the County's actions on remand substantively complied with the GMA.

Friends of the Law and the Coalition for Public Trust filed a petition in superior court to obtain review of the Board's Finding of Compliance.[5] The court dismissed Friends' challenge as moot, citing the earlier court ruling reversing the Board's remand order. This mootness ruling is before us in the second of the companion appeals.

In January 1996 Friends filed a land use petition seeking judicial review of the County Council's adoption of three ordinances that approved project permits and zoning code amendments for an urban development, the Port Blakely project. The trial court held that (1) there was no legal impediment to approval of the project, given the reversal of the December 1995 remand order, (2) the project's EIS was adequate and properly included reasonable alternatives, and (3) if Friends had a valid appearance of fairness challenge to the Council's proceedings, that challenge was waived. Friends' appeal of this ruling is the final matter addressed in this opinion.

## I

We first address Friends' appeal of the August 1996 trial court holding that the legal effect of the CPPs was to require the County to include the Bear Creek UPDs within its UGA. We hold that CPPs may have directive effect over a county's final designation of its UGA, and that the CPPs at issue in this case were sufficiently directive to have such an effect. Because the County was required to include the Bear Creek UPDs within its final UGA, we affirm the trial court.

## A
## STANDARD OF REVIEW

GMA comprehensive plans are presumed valid upon

---

[5]For purposes of this opinion, we will refer only to Friends of the Law (Friends).

adoption.[6] The Board shall find a comprehensive plan in compliance with the GMA unless it finds by a preponderance of the evidence that the county erroneously interpreted or applied GMA provisions.[7]

■ In reviewing the Board's actions, this court sits in the same position as the trial court, applying APA standards directly to the record created before the Board.[8] Under the APA, the reviewing court shall grant relief only if it determines that the Board's order is: (1) unconstitutional, (2) outside the Board's statutory authority or jurisdiction, (3) the result of unlawful procedure or decision-making process, (4) an erroneous interpretation or application of the law, (5) not supported by substantial evidence, or (6) arbitrary or capricious.[9]

■ We review questions of law de novo, although in that review substantial weight is given to an agency's view of the law, if the law falls within the agency's area of expertise and is ambiguous.[10] The Board was created by the GMA and is the entity charged with determining GMA compliance.[11] When the issue on review involves interpretation of legislation that is not a "model of clarity," in this case the CPPs enacted by the County, the enacting body's interpretation is entitled to great weight.[12]

We therefore owe deference to the County's interpretation of its own CPPs, and not to the Board's conflicting interpretation. Although the Board has expertise in the field of GMA compliance, it did not apply that expertise when it

---

[6]RCW 36.70A.320(1).

[7]*Id.*

[8]*Northwest Steelhead & Salmon Council of Trout Unlimited v. Department of Fisheries*, 78 Wn. App. 778, 785, 896 P.2d 1292 (1995).

[9]RCW 34.05.570(3).

[10]*NW Steelhead*, 78 Wn. App. at 786-87; *Peter Schroeder Architects v. City of Bellevue*, 83 Wn. App. 188, 191, 920 P.2d 1216 (1996).

[11]RCW 36.70A.250; 36.70A.280(1)(a).

[12]*See Federated Am. Ins. Co. v. Marquardt*, 108 Wn.2d 651, 656, 741 P.2d 18 (1987).

examined the Cpps and determined that they were ambiguous. There is no sound reason to defer to the Board in this area.[13]

## B
## COUNTYWIDE PLANNING POLICIES
## UNDER THE GMA

In enacting the GMA, the Legislature found that uncoordinated and unplanned growth poses a threat to the health, safety and quality of life.[14] The GMA required the County, and each city in the County, to adopt a comprehensive plan.[15] The County was also required to adopt a Countywide Planning Policy (CPP).[16] The comprehensive plan of each county or city "shall be coordinated with, and consistent with, the comprehensive plans adopted . . . [by] other counties or cities with which the county or city has, in part, common borders or related regional issues."[17]

The mechanism to implement this consistency directive was the requirement for CPPs. A CPP is

a written policy statement or statements used solely for establishing a county-wide framework from which county and city comprehensive plans are developed and adopted pursuant to this chapter. This framework shall ensure that city and county comprehensive plans are consistent as required in RCW 36.70A.100.[18]

Under the GMA, the legislative authority of the County

---

[13]See *Short v. Clallam County*, 22 Wn. App. 825, 832-33, 593 P.2d 821 (1979) (declining to defer to the Board of County Commissioners' interpretation of the State Environmental Protection Act (SEPA) because the Board, as only one of many agencies charged with implementing the policies of SEPA, did not possess any particular expertise in the environmental sphere).

[14]RCW 33.70A.010.

[15]RCW 36.70A.040(3)(d).

[16]RCW 36.70A.040(3)(a).

[17]RCW 36.70A.100.

[18]RCW 36.70A.210(1).

was required to convene a meeting with representatives of each city located within the County to establish a collaborative process that would provide a framework for the adoption of a CPP.[19] The CPP would be adopted only after a public hearing.[20]

Cities and the governor may appeal an adopted CPP to the Board within 60 days of adoption; citizens may not appeal.[21] Friends has not raised a constitutional challenge to the GMA's failure to allow citizen challenges to adoption of CPPs.[22]

■ We reject Friends' argument that interpreting a CPP to be directive of the designation of a final UGA allows the County to circumvent critical process requirements and shield the designation from public participation.[23] A CPP may provide substantive direction to city and county comprehensive plans if it: (1) meets a legitimate regional objective,[24] (2) is limited to providing substantive direction to the provisions of the comprehensive plan without directly affecting the provisions of an implementing regulation or other exercise of land use power, and (3) is consistent with other relevant provisions in the GMA.[25] Therefore, CPPs may constrain the County's discretion regarding where its final UGA will be located, and failure to follow

---

[19]RCW 36.70A 210(2)(a).

[20]RCW 36.70A.210(2)(e).

[21]RCW 36.70A.210(6).

[22]A number of constitutional challenges to RCW 36.70A.210 were recently raised, but were dismissed on lack of standing and lack of actual controversy grounds. *See Postema v. Snohomish County*, 83 Wn. App. 574, 585, 922 P.2d 176 (1996), *review denied*, 131 Wn.2d 1019 (1997).

[23]We also reject similar arguments made by amicus curiae, 1000 Friends of Washington.

[24]The GMA established the subjects that CPPs, as a minimum, were required to address. *See* RCW 36.70A.210(3). These subjects represent legitimate regional objectives.

[25]Because our view of the GMA comports with that of the Board, we adopt the above three-part test articulated in *City of Snoqualmie v. King County*, Central Puget Sound Growth Planning Hearings Board, Case No. 92-3-0004 at 62-63 (Mar. 1, 1993).

the directive force of a CPP may violate the GMA's consistency requirement.

## C
## KING COUNTY'S COUNTY-WIDE PLANNING POLICIES

In 1991 the cities located within King County agreed with the County on a process for the development of CPPs. The agreement created a Growth Management Planning Council (GMPC) which was to develop and recommend CPPs to the King County Council. In June 1992 the GMPC recommended initial CPPs, later adopted by the Council. Phase II CPPs were adopted in August 1994. The CPPs were not effective until ratified by at least 30 percent of the city and county governments representing 70 percent of the population of the County.

The County's 1994 comprehensive plan noted that, consistent with the CPPs and the GMA, "this Plan designates the Urban Growth Area for King County." The land use map in the plan includes the Bear Creek UPD sites within the UGA.

Friends argues that the CPP language is predominantly suggestive rather than directive, and that the CPPs are at most a recommendation intended to provide guidance to the County in designating its final UGA. For example, Friends points to a CPP declaring that the GMPC recognizes the Bear Creek sites as urban under "these" CPPs, and argues that this represents merely advice from the GMPC, and not a mandate to the Council to designate the sites as part of the final UGA. According to Friends, review of another CPP indicates that when the County intended language to be directive, it knew how to use such language, further emphasizing the advisory nature of the above CPP. Friends also focuses on a Phase II finding that the UGA maps are intended for planning purposes, and that the UGA in the policies is a dynamic policy line which provides general guidance to the Council when it adopts its final

UGA boundary in its 1994 Plan. Another Phase II CPP refers to the UGA "recommended" by the GMPC in the CPPs.

■ We reject Friends' selective interpretation of the CPPs. We are required to read legislation as a whole, and to determine intent from more than a single sentence.[26] Effect should be given to all of the language used, and the provisions must be considered in relation to each other, and harmonized to ensure proper construction.[27]

■ Fairly read in accordance with these principles, the CPPs directed the County to include the Bear Creek UPDs in the UGA when it designated the final UGA in its comprehensive plan. Furthermore, the "Proposed Urban Growth Area Line" on the CPP map unambiguously includes the Bear Creek UPDs. While it is true that the map also contains language stating that it is a planning policy recommendation to be followed by the Council when it adopts the final UGA in its 1994 plan, the map is subject to only one reasonable interpretation: the CPPs included the Bear Creek UPDs in the UGA.[28]

To summarize, we hold that the CPPs required the County to include the Bear Creek UPDs in its final UGA. Therefore, the CPPs dictated the result reached by the Board in its October 1995 order and the Board erred by later reversing that order. We affirm the trial court's reinstatement of the Board's October 1995 order.

## II
## TIMELINESS OF FRIENDS' CROSS-PETITION

In response to the County's initial petition for review of

---

[26]*State ex rel. Royal v. Board of Yakima County Comm'rs*, 123 Wn.2d 451, 459, 869 P.2d 56 (1994) (quoting *Service Employees Int'l Union, Local 6 v. Superintendent of Pub. Instruction*, 104 Wn.2d 344, 348-49, 705 P.2d 776 (1985) (quoting *Human Rights Comm'n v. Cheney Sch. Dist. No. 30*, 97 Wn.2d 118, 121, 641 P.2d 163 ((1982))).

[27]*Yakima County*, 123 Wn.2d at 459.

[28]*See In re Marriage of Kovacs*, 121 Wn.2d 795, 804, 854 P.2d 629 (1993) (only ambiguous legislation is subject to judicial interpretation; ambiguity exists if the legislation is subject to more than one reasonable interpretation).

the Board's order on reconsideration, Friends submitted an "Answer, Counter- and Cross-Petition."[29] The trial court granted motions to dismiss Friends' cross-petition as untimely because the cross-petition was filed more than 30 days after the Board's order.[30]

 Under the APA, a petition for judicial review of an agency order "shall be filed with the court . . . within thirty days after service of the final order."[31] Friends cross-petition was filed more than 30 days after service of the Board's final order. The APA establishes the exclusive means of judicial review of agency action, except "[a]ncillary procedural matters before the reviewing court" that are governed, to the extent not inconsistent with the APA, by court rule.[32]

The claims raised in Friends' cross-petition were not ancillary within the meaning of RCW 34.05.510(2). Ancillary procedural matters include "intervention, class actions, consolidation, joinder, severance, transfer, protective orders, and other relief from disclosure of privileged or confidential material."[33] We reject an interpretation of ancillary procedural matters that includes all claims raised by a respondent that, as Friends argues, could be characterized as dependent on an initial petition. Because Friends'

---

[29]In its petition, Friends asked the superior court to invoke its inherent power to review the Board's decision that it did not have jurisdiction to consider any issues outside the GMA. Friends also invoked the constitutional writ to address issues relating to the validity of the plan during the remand period. In this appeal, Friends does not seek review under the court's inherent power, and these issues are not before us.

[30]Almost a month before filing its cross-petition in this case, Friends filed a separate appeal of the Board's December 1, 1995 order in Snohomish County Superior Court. The petition was voluntarily dismissed after the County and Port Blakely challenged the petition on jurisdictional grounds because of service of process defects. The cross-petition filed in this case restates the petition filed in Snohomish County, including the same request for relief.

[31]RCW 34.05.542(2); see also RCW 36.70A.300(5) (under GMA, any party aggrieved by a final decision of the Board may appeal the decision to superior court within 30 days of the final order).

[32]RCW 34.05.510(2).

[33]Id.

claims were not ancillary, Friends may not invoke the court's jurisdiction to hear its untimely cross-claims by relying on the fact that the County's petition was timely.

Friends argues that because the APA is silent as to the time for filing a cross-petition, the civil rules apply.[34] Under the civil rules, Friends' petition would have been timely.[35] But when reviewing an administrative decision, the superior court acts in its limited appellate capacity.[36] All statutory procedural requirements must be met before a court's appellate jurisdiction is properly invoked.[37] The requirements of RCW 34.05.542(2) are therefore jurisdictional.[38] Because the issue here is substantive and jurisdictional, we reject Friends' request to use the civil rules to fill a gap in what it erroneously characterizes as procedural rules of a special proceeding.[39]

 Were we to conclude that the APA's silence on the time for filing a cross-petition warranted a gap-filling provision, we would not look to the civil rules. Civil rules are "clearly intended to apply only to civil actions invoking the

---

[34]*See* CR 81(a) ("Except where inconsistent with rules or statutes applicable to special proceedings, these rules shall govern all civil proceedings."); *see also Zesbaugh, Inc. v. General Steel Fabricating, Inc.*, 95 Wn.2d 600, 603-04, 627 P.2d 1321 (1981) (CR 81(a) mandates that statute controls only when there is an express inconsistency between civil rules and statute); *Scott v. Petett*, 63 Wn. App. 50, 57, 816 P.2d 1229 (1991) (court rules and statutes should be harmonized when possible).

[35]*See* CR 12; CR 55(a)(2).

[36]*City of Seattle v. Public Employment Relations Comm'n*, 116 Wn.2d 923, 926, 809 P.2d 1377 (1991).

[37]*Id.* at 926 (citing *Fay v. Northwest Airlines, Inc.*, 115 Wn.2d 194, 197, 796 P.2d 412 (1990)).

[38]*See Union Bay Preservation Coalition v. Cosmos Dev. & Admin. Corp.*, 127 Wn.2d 614, 617, 621, 902 P.2d 1247 (1995) (because petitioner failed to serve the parties of record as required by RCW 34.05.542(2), superior court lacked jurisdiction).

[39]*See Stikes Woods Neighborhood Ass'n v. City of Lacey*, 124 Wn.2d 459, 465-66, 880 P.2d 25 (1994) (only procedural aspects of statues of limitations, in the case RCW 1.12.040, are superseded by CR 6(a)).

general jurisdiction of the superior courts."[40] Instead we would analogize to the rules of appellate procedure (RAP), given the appellate jurisdiction of trial courts under the APA.[41] Under the RAP, Friends' cross-petition would have been untimely.[42]

 Friends argues that interpreting the 30-day rule in this manner will lead to wasteful and unnecessary litigation because parties must file protective appeals, rather than wait to see if an opponent first appeals. We agree that it would be helpful if the statute provided a separate time period for the filing of cross-petitions after the filing of an initial petition within 30 days. Such a determination, however, must be made by the Legislature, not the judiciary.[43]

 Because Friends did not file a timely petition for

[40]*Vasquez v. Department of Labor & Indus.*, 44 Wn. App. 379, 383, 722 P.2d 854 (1986); *see also Vasquez*, 44 Wn. App. at 386-88 (noting civil rules inapplicable to substantive, jurisdictional requirements and distinguishing appeals from an administrative agency from general jurisdiction of superior courts) (McInturff, J., concurring). *But see Department of Labor & Indus. v. City of Kennewick*, 99 Wn.2d 225, 229, 661 P.2d 133 (1983) (civil rules may apply when court sits in its appellate capacity, in the case, CR 54(e)).

[41]*See Vasquez*, 44 Wn. App. at 383 n.3 (court analogized to the RAP, because of superior court's appellate jurisdiction).

[42]*See* RAP 5.2(f) (if timely notice of appeal is filed by a party, any other party who wants relief from the decision must file notice of appeal within 14 days). The Board's final order was issued on December 1, 1995. The County's petition for review was dated December 22, 1995, and was filed on December 26, 1995. Friends' "Answer, Counter- and Cross-Petition" was dated January 31, 1996, and was filed the same day. We note that both the Quadrant Corporation and Port Blakely Tree Farms filed timely cross-petitions, within 30 days of the Board's December 1995 order.

[43]Similar policy arguments have been rejected by federal courts under the federal rules of appellate procedure (FRAP). *See Reich v. Trinity Indus., Inc.*, 16 F.3d 1149, 1155-56 (11th Cir. 1994) (dismissing cross-petition for lack of jurisdiction for failure to file within statutorily prescribed 60-day period applicable to "[a]ny person adversely affected or aggrieved" by order, and noting that failing to provide for a cross-appeal procedure like that created in FRAP 4(a)(3) leads to wasteful and nonproductive litigation, and welcoming examination of the problem by the advisory committee on appellate rules) (citing *Reich v. Occupational Safety & Health Review Comm'n*, 998 F.2d 134, 136-37 (3d Cir. 1993)); *see also Washington Utils. & Transp. Comm'n v. Federal Energy Regulatory Comm'n*, 26 F.3d 935, 941-42 (9th Cir. 1994) (rejecting the suggestion court should adopt a rule like FRAP 4(a)(3), which permits additional time for parties in civil cases to file cross-appeal once first party has filed an appeal, notwithstanding the positive

review of the separate claims it attempted to raise in its cross-petition, we affirm the trial court order granting motions to dismiss those cross-claims.[44]

## III
## "OTHERWISE COMPLIES" WITH THE GMA

 In its initial petition for review filed with the trial court, the County argued that even if the CPPs did not mandate inclusion of the Bear Creek UPDs in the County's final UGA, their inclusion otherwise complies with the GMA. Friends erroneously argues that in its December 1995 order the Board made a substantive ruling that the UGA designation was inconsistent with the GMA. In that order, however, the Board concluded that the County had not adequately justified the UGA designation and remanded to the County for it to consider doing so. We do not construe the order as a determination that the County's UGA designation violated the substantive requirements of the GMA.[45] The Board specifically declined to issue an order of invalidity. A remand to the County to provide additional justification for the UGA designation would not have been necessary if the Board had already determined that no amount of additional justification could validate the UGA designation.

aspects of such a rule, noting that such a request is best addressed to Congress). Note that unlike Washington's Rules of Appellate Procedure, the federal rules specifically provide that the 14-day extension permitted for filing cross-appeals does not apply in review of agency orders. *See* FRAP 20.

[44]*See Deschenes v. King County*, 83 Wn.2d 714, 716, 521 P.2d 1181 (1974) (court lacking jurisdiction may enter only order of dismissal); *see also Washington Utils.*, 26 F.3d at 941-42 (rejecting the argument that, as a jurisdictional matter, a petition for review of one aspect of order opens the entire order for review); *Reich v. OSHRC*, 998 F.2d at 136 (stating the general principle that an appellee who has not filed a timely cross-appeal may not attack the decree to either enlarge his own rights thereunder or lessen the rights of his adversary).

[45]*See* RCW 36.70A.300(2)(a) (finding of compliance and an order or remand shall not affect the validity of comprehensive plans and development regulations during the period of remand unless Board's final order also includes a determination that continued validity of the plan or regulation would substantially interfere with the fulfillment of the goals of the GMA). We also reject Friends' argument that because the Board found that the Bear Creek UPDs did not meet any of the locational criteria of the CPPs, and because these findings have not been appealed, they are verities in this appeal.

The issue of whether including the Bear Creek UPDs in the County's UGA otherwise complies with the GMA has been preserved as an issue on appeal.[46] Furthermore, notwithstanding the dismissal of Friends' cross-petition, the portions of that cross-petition that are responsive to the County's argument in this regard are also properly before this court. Nevertheless, because we hold that the CPPs directed the County to include the Bear Creek UPDs in its final UGA, we decline to address the County's argument that even if not required by the CPPs, inclusion of the Bear Creek UPDs within its final UGA complies with the GMA.[47]

## IV
## EFFECT OF THE AUGUST 1996 TRIAL COURT RULING: MOOTNESS

We next address Friends' appeal of the trial court order dismissing its petition for review of the Board's May 1996 Finding of Compliance. The petition was dismissed as moot due to the previous court order reversing the Board's December 1995 remand order. We hold that the underlying issue raised by that appeal is moot, and that the public interest exception to the mootness doctrine does not apply in this case.

## A
## EFFECTIVE RELIEF TEST

According to the May 1996 Finding of Compliance, the

---

[46]We also reject Friends' argument that the County has not preserved this issue by failing to comply with the rules of appellate procedure regarding a respondent's challenge to an administrative order. *See* RAP 10.3(h) (respondent challenging administrative order shall set forth concise statement of each error together with issues pertaining to each assignment of error). Although the County did not make any assignments of error in its brief, it included the challenge in its issues section.

[47]The County raises interesting arguments regarding the limits of the Board's power to prioritize among the statutory criteria for UGA lands, but resolution of those issues will have to await another case.

Board determines only procedural compliance at compliance hearings. The Board concluded that the County had procedurally complied with the remand order as to the Bear Creek UPD sites by adopting ordinances that designated the sites as fully contained communities pursuant to RCW 36.70A.350. The Board declined to address issues of substantive compliance with the goals and requirements of the GMA.

According to Friends, because the actions taken by the County pursuant to the Board's remand order remain in effect, a challenge to those actions is not moot. Friends contends that the earlier reversal of the order which led to the County's actions is immaterial and that a court order invalidating the ordinances passed by the County on remand would provide effective relief. An appeal is moot when it presents purely academic issues and when it is not possible for the court to provide effective relief.[48] If an appeal is moot, it should be dismissed.[49]

Friends' argument ignores the practical effect of the trial court order reversing the Board's remand order. The relief requested by Friends in its initial petition is premised on a conclusion that including the Bear Creek UPDs in the County's final UGA violates the GMA. Under the trial court order, designation of the Bear Creek UPDs within the County's UGA complies with the GMA. Because there is now no basis upon which to invalidate the challenged ordinances, we are unable to provide effective relief.

The County argues correctly that Friends has not raised an independent challenge to the ordinances adopted by the County on remand. Instead, the issue before us is whether the County remedied a lack of compliance with the GMA as identified by the Board. Because the Board's underlying or-

---

[48]*Klickitat County Citizens Against Imported Waste v. Klickitat County*, 122 Wn.2d 619, 631, 860 P.2d 390, 866 P.2d 1256 (1993).

[49]*Id.* at 631 (citing *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972)).

der has been reversed, proceedings before the Board have terminated, and the issue Friends attempts to raise is moot.

## B
## PUBLIC INTEREST EXCEPTION TO MOOTNESS DOCTRINE

We have discretion to retain and decide an appeal that has otherwise become moot if it involves a question of continuing and substantial public interest.[50] Criteria to consider include:

(1) whether the issue is of a public or private nature; (2) whether an authoritative determination is desirable for future guidance; (3) whether the issue is likely to recur; and (4) whether there is genuine adverseness and quality advocacy on the issues.[51]

Although the Board has announced a general rule for future proceedings, and the factual circumstances underlying this case are not likely to recur, it appears that an authoritative determination of the underlying issue may be desirable for future guidance. The Board has created a distinction between procedural and substantive compliance that is perplexing and may lack support in the provisions of the GMA.

■ Nevertheless, we decline to examine the procedural/ substantive distinction made by the Board in light of GMA language. On this record we are unwilling to issue a general holding that in all cases the Board must address both procedural and substantive compliance at a compliance hearing. Use of the public interest exception is not justified when the underlying claim is limited to the facts of the present case, and when future challenges of a similar

---

[50]*Id.* at 632.

[51]*Id.* (citing *Sorenson*, 80 Wn.2d at 558 and *Hart v. Department of Soc. & Health Servs.*, 111 Wn.2d 445, 448, 759 P.2d 1206 (1988)) (citation omitted).

nature will require examination and full litigation on the facts of that particular case.[52]

We hold that the following issue raised by Friends is moot: whether the GMA requires the Board, at a compliance hearing, to review both the procedural and substantive compliance of the actions taken by a county pursuant to a Board's remand order. Furthermore, we decline to address this issue under the public interest exception to the mootness doctrine.[53]

## V
## PROJECT SPECIFIC CHALLENGE UNDER THE LAND USE PETITION ACT

We turn now to Friends' appeal of the trial court order dismissing its Land Use Petition Act (LUPA) petition challenging project level permits and zoning code amendments for the Port Blakely project. First we hold that Friends' challenge to the County's UGA designation is outside the scope of a LUPA petition. Friends' argument on appeal misinterprets the legal effect of the remand provision of the GMA. We also uphold the adequacy of the EIS. Inclusion of the challenged alternative meets the rule of reason. Last, we hold that Friends waived any appearance of fairness challenge it may have had.

## FACTS

In 1989 Port Blakely Tree Farms submitted a Master Planned Development (MPD) predevelopment application to King County seeking approval for development of an area known as the Blakely Ridge property, located in the Bear Creek UPDs. Port Blakely later converted the application to an Urban Planned Development (UPD) application.

[52]*Hart*, 111 Wn.2d at 451.

[53]A motion to strike an appendix to Friends' opening brief has been passed to the merits. Because we do not reach the substantive compliance issue, we need not consider the challenged document as part of the record before us, and we therefore decline to address the merits of that motion.

Port Blakely proposed to develop a 1,080-acre site with an age-restricted community. A Draft Environmental Impact Statement (DEIS) was issued in April 1993. The Final EIS was issued in June 1995.

In July 1995 the King County Department of Development and Environmental Services issued a report to the King County Hearing Examiner recommending approval of the Blakely Ridge project with extensive conditions. The Hearing Examiner subsequently recommended that the Council approve the proposed UPD permit. The Council adopted King County Ordinance 11954 in September 1995, to reconcile the new regulatory framework and UPD process with the criteria of the former MPD scheme.

In October 1995 Friends appealed the Hearing Examiner's recommendation to the Council. In the appeal, Friends argued that the Council was in violation of the appearance of fairness doctrine. Friends also challenged the project's EIS on the ground that one of the alternatives discussed therein was unlawful and not reasonable.

The Council rejected Friends' appeal and passed three ordinances in December 1995 that approved the UPD permit and the preliminary subdivision of the plat and amended the zoning conditions applicable to the Port Blakely project.[54] Friends filed suit against King County and Port Blakely seeking judicial review of the Council's adoption of these ordinances under LUPA.

A
SCOPE OF A LUPA PETITION

Under LUPA, we may grant relief only if Friends carries its burden of establishing one of six standards for relief:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

---

[54]We note that under the County's comprehensive plan, if the applications necessary to implement the Bear Creek UPDs were denied by the County, then the property subject to the UPD was to be redesignated rural.

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.[55]

We review the decisions of the County based on the record created before the Hearing Examiner and the County Council.[56]

█ Enacted in 1995, LUPA is the exclusive means of obtaining judicial review of land use decisions.[57] Expressly excluded from judicial review under LUPA are "[l]and use decisions of a local jurisdiction that are subject to review by a quasi-judicial body created by state law, such as . . . the growth management hearings board."[58] The lawfulness of the County's UGA designation may not be reviewed in a LUPA petition because the challenged County action is subject to review by a growth management hearings board.[59] Friends' challenge to the County's UGA designation is outside the scope of a LUPA petition.

---

[55]RCW 36.70C.130(1).

[56]RCW 36.70C.120(1), 36.70C.130(1).

[57]RCW 36.70C.030(1); Laws of 1995, ch. 347.

[58]RCW 36.70C.030(1)(a)(ii).

[59]See RCW 36.70C.020(1); 36.70C.030(1)(a)(ii); 36.70A.280(1) (matters subject to Board review). Furthermore, neither the County's UGA designation nor the decision of the Board on appeal are "land use decisions" as defined by LUPA, RCW 36.70C.020(1).

## B
## LEGAL EFFECT OF A REMAND ORDER WITHOUT AN ACCOMPANYING DETERMINATION OF INVALIDITY

We also reject Friends' contention that it is not attempting to challenge the County's compliance with the GMA in its LUPA petition. According to Friends, the Board's remand order determined that the County's designation of the Bear Creek UPDs in the UGA violated the GMA, and therefore the legal effect of that order was to invalidate that designation. Friends argues that the County ignored the Board's ruling when it approved the Port Blakely project because under the ruling, the project was outside the properly designated UGA.

A finding of noncompliance and an order of remand "shall not affect the validity of comprehensive plans" during the remand period unless the Board's final order also includes a determination that "the continued validity of the plan or regulation would substantially interfere with the fulfillment of the goals" of the GMA.[60] Therefore, when the Board enters a remand order without also entering a determination of invalidity, counties may continue to process project applications and may grant project permits. Because the Board declined to issue a determination of invalidity, its ruling did not strike the Bear Creek UPD from the properly designated UGA.

Friends cites RCW 36.70A.300(3) and argues that because this case involves an application filed prior to the Board's order, the Board's failure to exercise its discretion to enter an order of invalidity has no effect on the issues presented here. We disagree. RCW 36.70A.300(3) addresses the effect of a determination of invalidity, not the effect of a remand order without an accompanying determination of invalidity. Under RCW 36.70A.300(2), a finding of noncompliance and an order of remand does not affect the validity of a comprehensive plan during the remand period. The

---

[60] RCW 36.70A.300(2)(a).

GMA therefore expressly authorized the County to act as it did in this case, that is, to approve project permits before taking steps to comply with the remand order.[61] The County did not erroneously interpret the law or act outside its authority.[62]

Friends also argues that the GMA provision giving the Board invalidity power does not replace this court's inherent power to determine compliance with state law. It argues that the County's ordinances are invalid, and thus inoperative.[63] As discussed above, however, without a determination of invalidity the County acted lawfully in approving the project specific permits and there is no basis to conclude that the County failed to comply with state law.[64]

To summarize, we reject Friends' challenge to the County's designation of its UGA under LUPA, and conclude that such a challenge is outside the scope of a LUPA petition. We also hold that Friends has misinterpreted the legal effect of a remand order unaccompanied by a determination of invalidity. Without a determination of invalidity, the Board's remand order did not affect the validity of the County's comprehensive plan, and the County was authorized to process and approve project applications. Although we retain the inherent authority to review the actions of the County for compliance with state law, the County has not exceeded its authority or violated the law.

C
ADEQUACY OF THE ENVIRONMENTAL IMPACT
STATEMENT

In December 1988 Port Blakely submitted an application

---

[61]Although Friends challenged the Board's failure to enter a determination of invalidity in one of the companion appeals, that challenge was included in Friends' untimely cross-petition, which we have held was properly dismissed.

[62]See RCW 36.70C.130(b), (e).

[63]See State ex rel. Goodner v. Speed, 96 Wn.2d 838, 843, 640 P.2d 13 (1982).

[64]Friends could have sought a stay of the project during the remand period, but did not. See RCW 34.05.550(2).

seeking to subdivide 1,017 acres of the Blakely Ridge property into 812 lots. The zoning in effect at the time permitted development at a density of one unit per acre. The Final Environmental Impact Statement for the project that was eventually permitted considered three alternatives to the proposal: (1) a residential development at one unit per acre, allowed under the prior zoning code but not the current code, (2) development at one unit per five acres, allowed under underlying rural zoning for the site, and (3) a no-action alternative.

According to Friends, the 1988 application filed by Port Blakely was not vested because the application was not complete. Friends argues that the false threat of a subdivision of one-acre lots as a probable alternative resulted in an inadequate EIS, an EIS that included an alternative that was not legally available.

■■ ■■ Friends asks this court to determine the vested status of the 1988 subdivision application, arguing that the County erroneously interpreted the law when it determined the vesting issue. Although the meaning of the "fully completed application" doctrine of RCW 58.17.033 involves a pure question of law that this court reviews de novo,[65] we decline to engage in such review in this case. The issue of the vested status of the one-acre lot subdivision application is not properly before us. The County did not decide that the one-acre lot subdivision application was vested.[66] Because there has been no "final determination by a local jurisdiction's body or officer" regarding the vested status of the ap-

[65]See Friends of the Law v. King County, 123 Wn.2d 518, 523, 869 P.2d 1056 (1994).

[66]The Hearing Examiner specifically rejected Friends' request to rule that the application was not vested, explaining that "[a]t worst, the legal status of the one-acre alternative is subject to the type of dispute that can only be finally resolved by a court of competent jurisdiction." The trial judge also declined to decide the issue, declaring that any conclusion about the legal vested status of the application would be speculation, that all parties knew the vesting issue was disputed, and that the matter had never been presented as resolved by a court. The Board's December 1995 order also addressed the vested status of the subdivision application. The Board declined to take a position on the issue, concluding that because the vested rights doctrine is a common-law doctrine, it did not have jurisdiction to determine whether a specific development application has vested.

plication, there has been no "land use decision" that may be reviewed by this court pursuant to a LUPA petition.[67] Were we to decide the issue, we would be rendering an advisory opinion, something we will not do.[68]

The adequacy of an EIS is subject to de novo review. However, agency determination of adequacy "shall be accorded substantial weight."[69] We review challenges to the adequacy of an EIS under the rule of reason.[70] Under this rule, the EIS must present decision-makers with a " 'reasonably thorough discussion of the significant aspects of the probable environmental consequences' " of the agency's decision.[71] An EIS must include a detailed statement regarding the alternatives to the proposed action.[72]

Friends contends that the EIS was fatally flawed because the County Council was misled by characterization of the one-acre lot alternative as a vested, viable option, and that the Council's decision was therefore based on an improper factor. To determine whether the EIS was adequate we apply the rule of reason, and not, as argued by Friends, an "improper factor" analysis. Friends' reliance on *Neah Bay Chamber of Commerce v. Department of Fisheries*[73] is misplaced. *Neah Bay* discussed the standard

---

[67]*See* RCW 36.70C.020(1), .030.

[68]*See Hutchinson v. Port of Benton*, 62 Wn.2d 451, 456, 383 P.2d 500 (1963) (court does not give advisory opinions). Because we decline to resolve the vesting issue, we also reject Friends' argument that including the one-acre lot alternative rendered the EIS inadequate because the alternative could not feasibly be attained. *See* WAC 197-11-440(5)(b).

[69]RCW 43.21C.090; *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 37-38, 873 P.2d 498 (1994).

[70]*Citizens Alliance To Protect Our Wetlands v. City of Auburn*, 126 Wn.2d 356, 361, 894 P.2d 1300 (1995).

[71]*Id.* at 362 (quoting *Klickitat*, 122 Wn.2d at 633).

[72]RCW 43.21C.030(2)(c)(iii).

[73]119 Wn.2d 464, 832 P.2d 1310 (1992).

adopted by the Legislature in RCW 34.05.570(2)(c) involving inquiries into the reasonableness of regulations.[74]

Reasonable alternatives in the EIS context include "actions that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation."[75] The primary purpose of an EIS is to ensure that SEPA's policies remain an integral part of the actions of state and local governments.[76] An EIS "shall provide impartial discussion of significant environmental impacts and shall inform decisionmakers and the public of reasonable alternatives."[77]

If we required all alternatives included in an EIS to be of certain legal status, projects would come to a halt until such status could be judicially determined, assuming that a determination could be obtained without issuing an advisory ruling. In order to avoid this outcome, EISs would include only unchallenged alternatives, rendering the discussion of reasonable alternatives superficial, and weakening their force as an effective decision-making tool.[78] There is no legal requirement that alternatives be certain or uncontested, only that they be reasonable.[79]

In this case, because there was uncertainty and a good faith dispute regarding the vested status of the challenged alternative, the EIS would likely have been inadequate if it failed to discuss the alternative, despite Friends' argument to the contrary. SEPA required the County to gather complete environmental information.[80]

Although Friends argues that the alternative was an

---

[74]*See Neah Bay*, 119 Wn.2d at 473.

[75]WAC 197-11-440(5)(b).

[76]WAC 197-11-400(1).

[77]WAC 197-11-400(2).

[78]*See* WAC 197-11-400(4) (EIS is more than a disclosure document, but shall be used to plan actions and make decisions).

[79]*See* WAC 197-11-440(5)(b).

[80]*See Adams v. Thurston County*, 70 Wn. App. 471, 481, 855 P.2d 284 (1993) (citing RCW 43.21C.030(2)(c) and 43.21C.031).

"extreme" alternative that was presented as having greater adverse environmental impacts, contrary to WAC 197-11--440(5)(b), Friends fails to establish that the one-acre lot alternative necessarily would have had greater environmental costs than the Port Blakely project proposal.[81]

Finally, we reject Friends' argument that including the one-acre alternative in the EIS coerced the Council into approving the project to avoid the necessary evils of the alternative. The disputed status of the subdivision application was known to the decision-makers.[82] The record does not reveal that the Council was misled into believing that the one-acre lot alternative would be developed if it did not approve the proposed project. There is no evidence that in the Council's decision-making process it considered the alternative for other than comparative purposes.[83]

We hold that the EIS was adequate because it sufficiently informed County decision-makers of the environmental consequences of the proposed project, permitting an informed

---

[81]The Hearing Examiner concluded that the challenged alternative represented a midpoint alternative, and that its consideration on that basis was appropriate despite its disputed legal status. Furthermore, no other development scenario existed which was more likely to occur than the challenged alternative, but was excluded from consideration by the selection of the alternative as an option for analysis. The Hearing Examiner also noted that the EIS's alternatives analysis would have been adequate even without the challenged alternative.

[82]At the request of the County Council, the King County Prosecuting Attorney's Office issued an opinion regarding the vested status of the subdivision applications. The prosecutor determined that a court would likely conclude that the subdivision applications were complete and vested. According to the Hearing Examiner, the responsible official was entitled to rely on this opinion in determining whether the one-acre alternative was a viable option, notwithstanding that such opinion might later be reversed in court.

[83]*See* WAC 197-11-440(5)(c)(v) ("One alternative . . . may be used as a benchmark for comparing alternatives."). Friends' argument appears to overshadow the fact that under the vested rights doctrine, SEPA still applies. Under SEPA, "[a]ny governmental action may be conditioned or denied." RCW 43.21C.060. Therefore, the County could condition or deny development under the one-acre lot application even if the project were allowed under zoning and building ordinances frozen at the time of vesting. *See Adams*, 70 Wn. App. at 481. The condition or denial would have to be based on SEPA policies adopted at the time of vesting. *Id.* at 481 n.11.

and reasoned decision.[84] The one-acre alternative satisfies the definition of a reasonable alternative and the rule of reason. We affirm the trial court's conclusion that the one-acre alternative was reasonable and properly included in the EIS.

## D
## APPEARANCE OF FAIRNESS DOCTRINE

■ Application of the appearance of fairness doctrine to local land use decisions is statutory.[85] The doctrine applies to the quasi-judicial actions of local decision-making bodies, and does not apply to legislative actions.[86]

At an August 1995 Council meeting, several councilmembers disclosed that they had had ex parte communications with project proponents. Friends challenged the adequacy of the disclosures at the meeting and later sent two written communications to the Council alleging that the councilmembers had not adequately disclosed the content of the ex parte discussions. Friends argued that this violated the appearance of fairness doctrine and deprived it of its statutory right to provide rebuttal to the required disclosures.

At a Council meeting in December 1995 when the issue of ex parte communications was raised by Friends, a councilmember asked Friends:

> But again, if I understand it, you're drawing it as a conclusion, retroactive to an ordinance already adopted and you're not asking members of this body to excuse themselves based on appearance of fairness.

Friends responded "that's right," and continued to argue that the disclosures were inadequate.

■ By declaring that it was not seeking recusal of the

---

[84]See *Weyerhaeuser*, 124 Wn.2d at 38 (required discussion of alternatives to proposed project of major importance because it provides basis for a reasoned decision among alternatives having differing environmental impacts).

[85]See RCW Chapter 42.36.

[86]RCW 42.36.010, .030.

councilmembers who had offered what it considered inadequate disclosures of ex parte communications, Friends waived its appearance of fairness challenge. A party cannot "sit back, hoping to achieve a desirable result from the [Council] despite the perceived unfairness, and then use that information to challenge an adverse result."[87] Because this is true, the appearance of fairness doctrine cannot be interpreted as establishing two independent remedies: recusal and full disclosure with an opportunity to rebut. When a party does not take advantage of the opportunity to preclude a decision-maker from participating in a decision on appearance of fairness grounds, that party waives the right to later challenge the decision on such grounds. Although Friends argues that waiver cannot be found without evidence of unequivocal acts or conduct showing an intent to waive, we do not look to the elements of common-law waiver.[88]

We hold that Friends waived its appearance of fairness challenge, and we therefore do not consider its argument that the Port Blakely project approval is void due to the Council's alleged violation of the doctrine.[89]

Although we do not reach the issue of whether the appearance of fairness doctrine was violated under the facts of this case, we note that the focus of the Council session at the time of the disclosures was a prior action taken by

---

[87]*City of Bellevue v. King County Boundary Review Bd.*, 90 Wn.2d 856, 863, 586 P.2d 470 (1978) (citing *Hill v. Department of Labor & Indus.*, 90 Wn.2d 276, 279-80, 580 P.2d 636 (1978) and *Choate v. Swanson*, 54 Wn.2d 710, 716-17, 344 P.2d 502 (1959)).

[88]*See Wagner v. Wagner*, 95 Wn.2d 94, 102, 621 P.2d 1279 (1980) (discussion of common-law waiver). Furthermore, waiver under the facts of this case is distinguishable from the waiver by silence held to exist in *Organization To Preserve Agric. Lands v. Adams County*, 128 Wn.2d 869, 887-88, 913 P.2d 793 (1996). The issue in this case is not whether Friends waived its right to object to the proceedings by failing to object, but whether it took advantage of the only opportunity it had to rectify what it considered a violation of the appearance of fairness doctrine.

[89]Our resolution of this issue renders it unnecessary to address the motion to strike an appendix to Friends' opening brief.

the Council in its legislative capacity. The appearance of fairness doctrine does not apply to legislative actions.[90]

Affirmed.

GROSSE and BECKER, JJ., concur.

Reconsideration denied April 17, 1998.

Review granted at 136 Wn.2d 1020 (1998).