[No. 41281-7-I. Division One. March 29, 1999.]

ASSOCIATION OF RURAL RESIDENTS, ET AL., *Respondents*, v.
KITSAP COUNTY, ET AL., *Appellants*.

384

G. *Richard Hill* of *Phillips McCullough Wilson Hill & Fikso, P.S.*; and *Russell D. Hauge, Prosecuting Attorney,* and *Evelyn S.A. Tanner, Deputy,* for appellants.

*David A. Bricklin* and *Claudia M. Newman* of *Bricklin & Gendler,* for respondents.

*Brian E. Lawler,* amicus curiae.

WEBSTER, J. — The Apple Tree Point Partners (the Partners) filed a plat and planned unit development (PUD) application for a 123-acre, wooded and undeveloped parcel located in Kitsap County, north of Kingston. This parcel lay outside the County's Interim Urban Growth Area (IUGA), designated under the Growth Management Act (GMA). The Kitsap County Commissioners approved the project, subject to mitigation measures. The Association of Rural Residents (the Residents), a group of neighboring landowners, appealed this decision to the superior court under the Land Use Petition Act. That court invalidated the Commissioners' approval on four independent alternative grounds: (1) the PUD constitutes urban growth outside the County's designated interim urban growth area and, therefore, violates the Growth Management Act; (2) the PUD was inconsistent with the County's zoning laws in effect at the time the Partners filed their completed development application; (3) the PUD application did not "vest" when it was filed because the PUD requested a rezone; and (4) the County's mitigated determination of nonsignificance (MDNS) for the project was improper and an Environmental Impact Statement (EIS) must be prepared. The Partners and the County appeal this decision.[1]

We affirm in part and reverse in part. The County Commissioners properly concluded the Partners' PUD application vested to the zoning laws in effect in 1994 when they filed it. We reverse the trial court's finding to the contrary. But the zoning laws to which the project vested included the County's Interim Urban Growth Area. Consequently, the project is subject to the GMA's prohibition against growth that is urban in nature, outside an urban growth area. Although the outline of the Kitsap Urban Growth Area changed in later years, the Apple Tree Point property has always been outside it. In the absence of any local ordinance defining "urban growth," we apply the GMA's

---

[1]Because the County joined in the Partners' opening brief and did not file its own brief, we refer to the two appellants collectively as either the "County" or the "Partners," where appropriate.

own definition, and conclude that the project constitutes urban growth. We therefore agree with the trial court that the commissioners' decision approving urban growth outside a designated urban growth area must be reversed, and remand for further proceedings consistent with our decision.

## PROCEDURAL HISTORY

The Apple Tree Point Partners own a 123-acre parcel of undeveloped land located in an unincorporated area approximately one to two miles north of Kingston in Kitsap County.

On December 15, 1994, the Partners submitted a combined preliminary plat and PUD application to the County, seeking approval of their plans to develop the parcel. Totally undeveloped, the property is mainly characterized by forest land intersected by a ravine and bordered on the east by high slopes. It contains bald eagle perches, a bear den, and is home to a large variety of other wildlife. The property may be accessed only by Lindvog Road, a twenty-foot wide, paved county roadway with modest gravel shoulders. From the plat's entrance, the road extends about one mile southbound where it meets a state highway.

The development proposal includes plans to develop 106 residential lots, with on-site septic systems and water to be provided by the Kitsap County Public Utility District. These lots would consume about 52 of the 123 total acres, leaving the rest for open space (including a ball park) and roadways. The resulting average lot size is slightly less than half an acre in size, with overall density proposed at about one unit per 1.13 acres.

When the Partners filed their application, the Rural 2.5 zoning applicable to the property allowed only one dwelling unit per 2.5 acres with a minimum lot size of 100,000 square feet. But the PUD zoning ordinance permitted overall density to reach one dwelling unit per acre so long as the development was "not unreasonably incompatible with

surrounding properties and [did] not require any capital construction costs to the public[.]" Consistent with the non-PUD, Rural 2.5 zone requirements, the surrounding properties to the north, west, and south vary from 2.5- to 50-acre parcels. Directly to the east, but separated from the Partners' property by steep slopes, are developed waterfront lots zoned for two dwelling units per acre.

On July 20, 1995, County staff issued a mitigated determination of nonsignificance under the State Environmental Policy Act (SEPA) for the Partners' PUD. The Association of Rural Residents, an organization of neighboring landowners, appealed the MDNS to the hearing examiner. The hearing examiner's decision, issued on October 30, 1995, recommended affirming the MDNS with a 70-lot project. In the examiner's opinion, the project as proposed would have required an EIS.

Both the Partners and the Residents appealed the hearing examiner's decision to the Board of County Commissioners. On January 22, 1996, the commissioners approved the project as proposed by the Partners and affirmed the MDNS. The Residents appealed the commissioners' approval decision to King County Superior Court pursuant to the Land Use Petition Act (LUPA), RCW 36.70C.

One theory of their appeal was that the Apple Tree Point project was urban growth that could not, under the Growth Management Act, occur outside a designated urban growth area. Pursuant to the Legislature's mandate in the Growth Management Act, Kitsap County adopted an ordinance in 1993 designating interim urban growth areas. The Partners' property was outside the IUGA designated for the area of Kingston.

The Association of Rural Residents appealed the Kingston IUGA to the Central Puget Sound Growth Management Hearings Board (CPSGMHB or Board). In June 1994, the Board found the IUGA did not comply with the GMA, and remanded it to the County with directions to bring it into compliance by October 3, 1994. Missing the Board's

deadline by several months, the County issued its final GMA comprehensive plan and development regulations on December 29, 1994, including a final urban growth area as required by RCW 36.70A.110(5) and (6).

The next year, on October 6, 1995, the Board again determined that Kitsap County was not in compliance with the GMA. This time, using its new power to invalidate county plans, the Board struck down the entire Kitsap County comprehensive plan, implementing regulations, and UGAs, as invalid under the GMA. Following this action by the Board, on October 23, 1995, the County adopted a new IUGA and an interim zoning code. The Partners' property, still outside the IUGA, was rezoned rural medium density (five-acre minimum lot sizes). The new code's PUD provision subjected all residential PUDs to the density limits prescribed by the zone in which the PUD would be located.

In their appeal to the county commissioners concerning the Apple Tree Point Project, the Residents contended the 1995 zoning now precluded the project with its overall density, as designed, of one lot per acre. The Residents also argued that even if the Partners were vested to the rules in effect in 1994, those rules included the interim urban growth area designated by the county in 1993. The commissioners rejected the arguments of the Residents, and approved the project as designed.

The superior court reversed the commissioners' approval on four alternative grounds: (1) the project is prohibited under the GMA because it is urban development outside the urban growth area (UGA); (2) the Partners' development rights did not vest upon application, and their project was not in compliance with the later-enacted ordinance that required five acres per dwelling unit; (3) if the project did vest and the earlier PUD zoning ordinances are applied, the project is unreasonably incompatible with the surrounding properties; and (4) an EIS was required.

The Apple Tree Point Partners and the County appeal.

The Building Industry Association of Washington (the Builders) participates in this appeal as amicus curiae.

## STANDARD OF REVIEW

▮▮▮▮ The Residents appealed the commissioners' decision under the Land Use Petition Act, RCW 36.70C.[2] The Superior Court reviewed the commissioners' decision based on the record created before the commissioners, *see King County v. Central Puget Sound Growth Management Hearings Bd.*, 91 Wn. App. 1, 26, 951 P.2d 1151 (citing RCW 36.70C.120(1), .130(1)), *review granted,* 136 Wn.2d 1020 (1998), and was bound to affirm the commissioners' factual findings unless they were clearly erroneous. But the court was free to independently determine the law and apply it to the facts as found by the hearing examiner and the commissioners. *See Clarke v. Shoreline Sch. Dist. No. 412,* 106 Wn.2d 102, 109, 111, 720 P.2d 793 (1986); *Franklin County Sheriff's Office v. Sellers,* 97 Wn.2d 317, 324-25, 646 P.2d 113 (1982). Statutory construction is a question of law reviewed de novo under the error of law standard. *See Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n,* 123 Wn.2d 621, 627-28, 869 P.2d 1034 (1994) (citing *City of Pasco v. Public Employment Relations Comm'n,* 119 Wn.2d 504, 507, 833 P.2d 381 (1992); *Inland Empire Distrib. Sys., Inc. v. Utilities & Transp. Comm'n,* 112 Wn.2d

---

[2]LUPA is the exclusive means for obtaining judicial review of land use decisions. *See Tugwell v. Kittitas County,* 90 Wn. App. 1, 7, 951 P.2d 272 (1997). In part, RCW 36.70C.130 provides:

(1) . . . The [superior] court may grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in (a) through (f) of this subsection has been met. The standards are:

. . . .

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts . . . .

278, 282, 770 P.2d 624, 87 A.L.R.4TH 627 (1989)). A court will afford deference to an agency's construction of a statute, but only if the statute is ambiguous and the agency is charged with the administration and enforcement of the statute at issue. *Id.* Such agency interpretation is given "great weight" in determining legislative intent. *Id.* (citing *Pasco*, 119 Wn.2d at 507 (citing *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813-14, 828 P.2d 549 (1992))). The authority to interpret statutes ultimately lies with the courts. *Id.* (citing *Sellers*, 97 Wn.2d at 325-26). Thus, the superior court was also free to construe the nonambiguous provisions of the GMA and the Kitsap County ordinances without deferring to construction placed upon them by the commissioners. The same standard of review guides us, as we are in the same posture as the superior court in resolving the issues on appeal. *Id.*

## VESTING

██ ██ In deciding that the commissioners erred in approving the project, the trial court concluded in part that the project did not vest at the time of application. RCW 58.17.033, the subdivision statute, "vests" not only the right to divide property, but also the right to develop it. *Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 275, 278, 943 P.2d 1378 (1997). We held, in *Schneider Homes, Inc. v. City of Kent*, 87 Wn. App. 774, 779, 942 P.2d 1096 (1997), *review denied*, 134 Wn.2d 1021, 958 P.2d 316 (1998), that a PUD application accompanying a preliminary plat application is also vested on the date such applications are submitted. Under *Schneider Homes*, the Partners' December 15, 1994, preliminary plat/PUD application for the Apple Tree Point project vested on that date.[3] Accordingly, we reverse the trial court on this point. The Partners had a vested right to have their project considered only under the

---

[3]Because our recent decision in *Schneider Homes* is dispositive, we need not address the Residents' argument that the Partners and the County are judicially estopped from arguing a PUD is not a rezone. And because the Residents' request for attorney fees is also based on this judicial estoppel argument, *see* Resp't's Br. at 61-62, we do not grant this request.

land use statutes and ordinances in effect on December 15, 1994.

### EFFECT OF INTERIM URBAN GROWTH AREA

We now discuss the primary issue in this appeal: whether the Apple Tree Point project violates the Growth Management Act because it constitutes impermissible "urban growth" outside an urban growth area.

The Legislature enacted the GMA in 1990 to control and regulate growth. *See City of Redmond v. Central Puget Sound Growth Management Hearings Bd.*,136 Wn.2d 38, 57, 959 P.2d 1091, 1100 (1998). For the first time, the State established substantive standards against which local comprehensive plans and land use regulations are to be judged. Each county was required to "designate an urban growth area or areas within which urban growth shall be encouraged and *outside of which growth can occur only if it is not urban in nature.*" RCW 36.70A.110(1) (emphasis added).

In 1991, the Legislature amended the GMA, establishing Growth Management Hearings Boards to review county compliance with the GMA's requirements. Under former RCW 36.70A.300(2), a board was authorized to remand any finding of noncompliance to the county for compliance. Ultimately, the Governor was authorized to impose sanctions for GMA noncompliance, *see* former RCW 36.70A.330, .340, .345, but until 1995, the enforcement authority of a hearings board included only the power to remand. In 1995, the Legislature conferred upon the hearings boards the additional power to invalidate certain county plans or regulations that substantially interfere with fulfilling the GMA's goals. *See Skagit Surveyors & Eng'rs, L.L.C. v. Friends of Skagit County*, 135 Wn.2d 542, 549, 958 P.2d 962 (1998).

The Partners filed their application on December 15, 1994, during the period when the 1993 Kingston Interim Urban Growth Area (IUGA) was on remand from the hearings Board to have it brought into compliance with the

GMA. It was not until December 29, 1994, that the county adopted a revised IUGA. The Partners contend that the remand "voided" or invalidated the 1993 IUGA, but they cite no authority to support this contention. *See Grant County v. Bohne*, 89 Wn.2d 953, 958, 577 P.2d 138 (1978) ("Where no authorities are cited, the court may assume that counsel, after diligent search, has found none.") (citing *In re Cassel*, 63 Wn.2d 751, 388 P.2d 952 (1964)). Nothing in the statute equates a board's finding of noncompliance with a determination of invalidity. The 1995 amendments clarified that an order of remand upon a finding of noncompliance, without a determination of invalidity, does not affect the validity of comprehensive plans and development regulations during the period of remand. There is no basis for a conclusion that the hearings boards had the power to invalidate local land use regulations prior to the 1995 amendment. We therefore reject the contention that the order of remand deprived the IUGA of regulatory effect.

■ ■ The Partners and amicus principally argue that the County's IUGA is no more than a "line on a map," lacking in regulatory effect because no development regulations accompanied it to advise property owners of what kind of growth was permitted on either side of the line. The Residents respond that the GMA prohibition of urban growth outside of the designated IUGA does not depend on the enactment of local regulations to make it effective.

■ ■ The requirement for interim growth area designations was added to the Act by amendment in 1993, at the same time the Legislature delayed the deadline for local governments to complete the new planning required by the Act. LAWS OF 1993, 1st Ex. Sess., ch. 6, § 2, RCW 36.70A.110. In interpreting the GMA, our primary objective is to carry out the Legislature's intent. *See Leslie v. Verhey*, 90 Wn. App. 796, 803-04, 954 P.2d 330 (1998), *review denied*, 137 Wn.2d 1003 (1999). The intention behind the mandate for designation of interim urban growth areas clearly was to prevent urban growth from occurring in ru-

ral areas while the planning process continued. To hold that the county's pre-GMA land use regulations continue to control development outside the IUGA until the county enacts local ordinances that comply with the GMA would render ineffective and meaningless the statute's requirement for designation of an interim urban growth area. We therefore hold that the designation of an interim urban growth area can be, even in the absence of enabling local ordinances, an effective development regulation.

In selecting an urban growth area a county designates an area "within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature." RCW 36.70A.110(1). Prior to the 1997 amendments,[4] "urban growth" was defined as "growth that makes intensive use of land for the location of buildings, structures, and impermeable surfaces to such a degree as to be incompatible with the primary use of such land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources." Former RCW 36.70A.030(16) (1996). The Partners and amicus contend the 1993 IUGA designation violates due process because, without an enabling local ordinance defining what constitutes "urban growth," the designation is unconstitutionally vague.

■■ When a challenged ordinance involves land use regulation, the ordinance is judged as applied, not evaluated for facial vagueness. *See Burien Bark Supply v. King County*, 106 Wn.2d 868, 871, 725 P.2d 994 (1986). An ordinance must contain ascertainable standards for adjudication in order to limit arbitrary and discretionary enforcement of the law. *Bohne*, 89 Wn.2d at 955. The Partners argue only that the IUGA line is meaningless because the county failed to adopt a local definition of "urban growth." They have not responded to the argu-

---

[4]The Legislature amended the GMA's definitions of "urban growth" and "urban governmental services," and included definitions for "rural development," and "rural governmental services." RCW 36.70A.030. While we recognize these amendments do not retrospectively apply to the issues before us, *see* Laws of 1997, ch. 429, § 53, they are not inconsistent with our analysis.

ment that the statutory definition may provide sufficient content where the local agency has failed to adopt its own definitions implementing the IUGA.

While the GMA definition of "urban growth" may not be sufficiently specific to serve as a controlling regulation in every case where local regulations have not been adopted, the question here is whether it provides fair warning that the Apple Tree Point Project will not be permitted outside a designated urban growth area. As discussed above, the courts must strive to give effect to the statute. Because the Partners have not even attempted to show that their project does not fit squarely within the GMA definition of "urban growth," we conclude the statutory definition is not unconstitutionally vague as applied.

 Relying on *Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 947 P.2d 1208 (1997), the Partners argue that the County's pre-GMA zoning ordinance defining the level of growth permitted in a PUD in the Rural Zone is a specific local regulation that trumps the more general GMA definition of "urban growth." In *Mount Vernon*, a developer sought approval of a commercial planned unit development that involved annexing and rezoning the subject property. *Id.* at 863. Although the Court found the proposed development conflicted with the zoning code at issue, it reiterated the rule that conflicts between a general comprehensive plan and a specific zoning code are resolved in the code's favor because the comprehensive plan is merely a planning guide, not a land use decision-making tool. *Id.* at 873-74. Here, we are faced not with a difference between a local plan and local regulations, but a difference between local regulations and a state statute both defining in their different ways where urban growth is permissible and where it is not permissible. Where a local ordinance cannot be harmonized with a conflicting statute, the statute prevails. *See Weden v. San Juan County*, 135 Wn.2d 678, 693, 958 P.2d 273 (1998) (citing article XI, section 11 of the state constitution, and quoting *Brown v. City of Yakima*, 116 Wn.2d 556, 559, 561, 807 P.2d 353 (1991)).

█ An ordinance conflicts with a statute if it permits what the statute forbids, or vice versa. *See id.* (quoting *City of Bellingham v. Schampera*, 57 Wn.2d 106, 111, 356 P.2d 292, 92 A.L.R.2D 192 (1960)). The question, therefore, is whether the local PUD ordinance and zoning to which the Apple Tree Point project is vested permits that which the statutory definition of "urban growth" prohibits, or vice versa. If the two are in conflict, the GMA controls.

█ As illustrated by the commissioners' approval of the Apple Tree Point project, the Kitsap County pre-GMA zoning and PUD ordinance allows urban growth to occur outside the 1993 interim urban growth area. The Apple Tree Point project contemplates utilizing half of the entire 123-acre parcel for over a hundred residential lots averaging roughly 20,000 square feet. The project envisions utilizing the remaining acreage for roadways, a ball park, and open space. The Partners have not attempted to show how such a project could be compatible "with the primary use of such land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources." Former RCW 36.70A.030(15). Because Kitsap County's pre-GMA land use regulations permit what the statute prohibits, they are not controlling.

We recognize that the term "urban growth" will be subject to further definition as local agencies develop their plans and regulations under the GMA and obtain review and approval by the hearings boards. The specific densities, lot sizes, clustering rules, and infrastructure that constitute "urban growth" may vary from area to area. Still, the statute's own definition of urban growth is not so vague and general that the courts cannot apply it as a limiting principle where appropriate.

In sum, the superior court correctly determined that the commissioner's approval of the Apple Tree Point project violated the GMA because it allowed development "urban in nature" to occur outside the area they had designated for interim urban growth. The superior court decision is affirmed on that ground. We remand the Apple Tree Point

Project to the County for further proceedings in light of our decision.[5]

BECKER, J., concurs.

GROSSE, J. (dissenting) — The majority has either had the wool pulled over its eyes in this case, or is engaging in policy making regarding the Growth Management Act (GMA) that goes well beyond legislative intent. The majority is correct on the issue of vesting. This project is vested. But, where the majority goes awry is with the nature and scope of the development regulations in effect at the time the application was filed, and with the impact of the growth management process on those regulations and the application. The majority improperly replaces the Growth Management Hearings Board (GMHB) with the courts as the ultimate arbiter of what is rural and what is urban, totally outside the process envisioned by the Legislature.

At the time of the application, the GMA required the GMHB to review and remand a county's comprehensive plan, including the county's interim urban growth areas (IUGA), if they were not in compliance with the GMA. At that time, in contrast to current law, it did not allow the GMHB to invalidate a proposed plan, or applicable county regulations. Indeed, the GMA provisions then in effect expressly provided that existing zoning regulations remained in effect while the growth management process continued.

Here, Kitsap County adopted an IUGA in 1993 and

---

[5]Because we affirm on this ground, we need not and do not decide whether the PUD also violates the County's own zoning code because it is unreasonably incompatible with surrounding land use. Nor do we decide whether the project requires an EIS. The Apple Tree Point project cannot move forward unless it transforms into a project that preserves the nonurban character of the parcel and its surrounding properties. Consequently, the changing nature of the project may raise additional considerations for SEPA purposes. On the other hand, many of the underlying studies performed for the project—for example, the wildlife, slope, water, and traffic studies—may still apply as the Partners redefine the contours of their proposed development. But without knowing the dimensions of those new contours, we cannot conclusively determine whether an EIS is required or if a MDNS would suffice in the future.

imposed zoning rules, one of which allowed the type of rural planned unit development at issue here. Again, it must be noted that the GMA left to local agencies the discretion to define the terms and conditions applicable to development in both urban and rural areas, subject to review by the GMHB. In 1994, the 1993 IUGA was disapproved by the GMHB and sent back to Kitsap County, primarily because the GMHB believed Kitsap County's proposed IUGA was too big. This action did nothing with respect to rural areas or to then existing development regulations in rural areas.

Had Kitsap County complied with the GMA in the first instance, what was rural would have remained rural. This property would have remained rural and would have had development regulations for rural zoning, including rural planned unit developments. It is true that in 1995 the GMHB invalidated Kitsap County's attempts at compliance with the GMA because, in part, the permitted rural densities were too high. But again, this action could have no effect on this application, as it was vested in the rules in effect in 1993, rules the GMHB had no power to invalidate.

The character of development in rural areas is a sophisticated and highly complex question that the GMA wisely leaves to local discretion, subject to review by the GMHB for compliance with the guidelines of the GMA. The GMA itself expressly allows some development in rural areas at higher densities, subject to requirements for clustering, density transfers, and other creative mechanisms. RCW 36.70A.070(5). Here, the trial court and the majority of this court vitiate this process, indeed ignore it, and simply conclude that this is an urban project because it increases the need for government services. Leaving aside the question of just how it is that the courts can insert themselves this way in the process, this broad sweep is contrary to the necessarily complex process put in place by the Legislature.

I would reverse and remand with instructions that the project be permitted to proceed.

Review granted at 138 Wn.2d 1008 (1999).