[No. 68027-2. En Banc.]
Argued November 18, 1999. Decided July 20, 2000.

ASSOCIATION OF RURAL RESIDENTS, ET AL., *Respondents*, v. KITSAP COUNTY, ET AL., *Petitioners*.

*G. Richard Hill* (of *Phillips McCullough Wilson Hill & Fikso, P.S.*); and *Russell D. Hauge, Prosecuting Attorney,* and *Evelyn Tanner, Deputy,* for petitioners.

*David A. Bricklin, Michael W. Gendler,* and *Claudia M. Newman* (of *Bricklin & Gendler*), for respondents.

*Stephen H.G. Overstreet* on behalf of Building Industry Association of Washington and Keith Birkenfeld, amici curiae.

*Brian E. Lawler* on behalf of Building Industry Association, amicus curiae.

GUY, C.J. — Apple Tree Point Partners (Partners) asks this court to determine what land use regulations apply to the proposed development. We find that the former Kitsap County Zoning Ordinance applies because at the time in question the interim urban growth area (IUGA) had not been amended within the period of remand from the growth management hearings board (GMHB) and was therefore not in effect. As a result, land use permits were governed by preexisting zoning ordinances and not by the IUGA and Growth Management Act (GMA), chapter 36.70A RCW. We affirm the Court of Appeals holding that the application vested to the zoning laws in effect when the application was filed. We reverse its holding that, because the development is incompatible with the GMA, it cannot be approved. Because there was no GMA plan or regulation in effect on the date the application was submitted, the decision to approve or deny the plat and planned unit development

(PUD) must be based on the pre-GMA Kitsap County zoning ordinances. Finally, we remand this case to the trial court for review, using the proper standard, of the county commissioners' decision not to require an environmental impact statement.

## GMA BACKGROUND

Before we reach the issues this case presents, some background on how the GMA was developed is necessary to shed light on the reasoning behind our decision. Land use planning in Washington has historically been a function left to local governments with the state playing a limited role. Eric S. Laschever, *An Overview of Washington's Growth Management Act*, 7 PAC. RIM L. & POL'Y J. 657, 658 (1998). With the passage of the GMA, the system changed to a comprehensive planning framework under which local governments are required to plan according to general mandates established by the Legislature. *See* chapter 36.70A RCW. The GMA was a legislative compromise, and how it is carried out and enforced is a reflection of this compromise. As one commentator has stated: "unlike [the State Environmental Policy Act of 1971 (SEPA), chapter 43.21C RCW] and [the Shoreline Management Act of 1971, chapter 90.58 RCW], GMA was spawned by controversy, not consensus. The relative spheres of state mandate and local autonomy were the product of extremely difficult legislative compromise." Richard L. Settle, *Washington's Growth Management Revolution Goes to Court*, 23 SEATTLE U. L. REV. 5, 34 (1999). Moreover,

> [b]ecause the recommendations of the Growth Strategies commission were variously embraced, rejected, and ignored by the wrangling legislature, the GMA was not the finely-honed product of a law revision commission. Both installments of the Act were riddled with politically necessary omissions, internal inconsistencies, and vague language, sometimes consciously designed to defer the final reckoning to another day and, perhaps, another forum.

*Id.* at 8 (footnotes omitted). As a result of this legislative compromise, some growth that is contrary to the GMA was allowed in the initial years of implementing the act.

Enforcement contributes to the problem of obtaining local government compliance with the GMA. The GMA is different from other land use statutes in that the enforcement mechanisms are largely absent.[1] Because the GMHBs do not have the ability to directly sanction counties for failing to comply with the GMA, compliance is more difficult to obtain. In the early years of the GMA when several counties did not comply, some incompatible growth was allowed to occur.

## FACTS

The project at issue is on 123 acres of undeveloped land in North Kitsap County, north of unincorporated Kingston. Ex. 87, at 24, 26; Map 7. Partners' proposed PUD consists of 106 single-family lots on the 123 acres. Ex. 6. The overall density would be one unit per 1.16 acres. Ex. 6. At the time of the application, the property was zoned rural 2.5, which allowed one housing unit per 2.5 acres. Ex. 87, at 24. The former Kitsap County Zoning Ordinance section in effect at the time of the application permitted the overall density in rural 2.5 acre zones to be increased to one unit per acre "provided the [PUD] proposal is not unreasonably incompatible with surrounding properties and does not require any capital construction costs to the public." Former Kitsap County Zoning Ordinance § 14p, at 38. Parcels ranging

---

[1] Enforcement in other contexts like the Shoreline Management Act of 1971 (SMA), is entrusted to a state agency. *See* RCW 90.58.300. Under the SMA, the Department of Ecology (DOE) must approve every local shoreline plan before it may be used to regulate land use. Every shoreline plan must be submitted to the DOE for approval regardless of whether or not it is challenged. RCW 90.58.140. Under the GMA, the only way a GMHB reviews a regulation is when it is challenged. RCW 36.70A.280. As a result, a GMA plan can conflict with the GMA, but the GMHB can do nothing about it. Moreover, the DOE reviews and can veto shoreline project proposals. The GMHBs do not have the authority to review individual proposals. The DOE can impose sanctions itself by denying shoreline plan and project approval. RCW 90.58.140. The GMHBs' enforcement authority consists only of being able to declare plans invalid and send them back for compliance. RCW 36.70A.302. The GMA allows only the governor to impose sanctions by fining the county, withholding funds, or imposing some other monetary sanction. RCW 36.70A.340.

from 2.5 to 50 acres surround the area from the north, west, and south. Ex. 50. To the east, but separated from Partners' property by steep slopes, are developed waterfront lots zoned for two dwelling units per acre. Ex. 50.

The only access to the site is on the west from Lindvog Road. Ex. 87, at 24. Lindvog Road is a paved, 20-foot-wide road extending for approximately one mile north from State Highway 104 to the property. Ex. 87, at 24. The project plan includes the following changes to be made to the property: off-site road improvements, water service improvements and on-site septic systems. Ex. 6; Ex. BB. The site is covered entirely with forest. Ex. F at 1; Ex. Z at 17. There is wildlife on the property, including black bear, deer, river otters, coyote, red foxes, flying squirrels, tree frogs, salamanders and numerous species of birds, including bald eagles. Ex. 2. There are steep slopes and bluffs throughout the property. Ex. 87, at 24; Ex. L; Ex. BB at 1.

On December 15, 1994, Partners submitted a combined preliminary plat and PUD application to the County. Ex. 6. On July 20, 1995, the County issued a mitigated determination of nonsignificance (MDNS) under SEPA for the Partners' PUD. Ex. 2. The Association of Rural Residents (Residents) appealed this decision to the hearing examiner. The hearing examiner recommended affirming the MDNS with a 70-lot project. Ex. 87, at 29. Both Partners and Residents appealed this decision to the board of county commissioners. The county commissioners approved the project as proposed by Partners and affirmed the MDNS. Residents then filed a land use petition under the Land Use Petition Act (LUPA), chapter 36.70C RCW, in superior court. Clerk's Papers at 1-54.

The superior court struck down the county commissioners' decision for four reasons. First, it determined that the PUD was urban growth outside the IUGA and therefore violated the GMA. Clerk's Papers at 359. Second, the court held that Partners did not have a vested right to have the application considered under the laws in effect at the time of filing. Clerk's Papers at 363-65. Third, the court found

that even if it applied the ordinance in effect at filing, the development was unreasonably incompatible with the surrounding property. Clerk's Papers at 367. Finally, the trial court ruled that if the project were allowed to proceed, an environmental impact statement (EIS) would be required because the project had a significant environmental impact. Clerk's Papers at 368. In a split decision, the Court of Appeals affirmed in part and reversed in part, holding that Partners did have a vested right to develop under the zoning laws in effect at the time but that the development was not permitted because it was outside the designated IUGA under the GMA. *Association of Rural Residents v. Kitsap County*, 95 Wn. App. 383, 386, 974 P.2d 863 (1999). Partners appealed that decision to this court and asks us to affirm the decision by the county commissioners to allow the development.

## ISSUES

(1) What land use regulations were in effect at the time the proposal was submitted, and which are to be applied to the development application?

(2) Did the plat application coupled with a PUD proposal vest to the rural 2.5 zoning at the time the application was submitted?

(3) Was the MDNS proper under SEPA?

## DISCUSSION

### Land Use Regulations

The timeline of events is critical in deciding what land use regulations were in effect at the time the completed application was submitted. Kitsap County identified an IUGA on October 4, 1993. Soon after that, Residents sought review of the IUGA by the GMHB. On June 3, 1994, the GMHB concluded that the IUGA was not in compliance with the GMA and remanded it for compliance by October 3, 1994. Kitsap County did not amend the IUGA by October 3,

1994. On December 15, 1994, Partners submitted a completed preliminary plat application and PUD proposal. On December 29, 1994, Kitsap County adopted a comprehensive plan including final urban growth areas. On October 6, 1995, the GMHB determined that the 1994 comprehensive plan was invalid because it was inconsistent with the GMA.

■ Because Kitsap County did not modify the IUGA until December 29, 1994, when it adopted a comprehensive plan pursuant to the GMA, the IUGA was not in effect at the time Partners submitted the completed application. Kitsap County was required to bring the noncomplying IUGA into compliance by October 3, 1994. It did not. At the time the application was submitted, the period of remand had expired. Under current law, a noncomplying regulation remains in effect *during the period of remand*. RCW 36.70A.300(4).[2] This allows the noncomplying IUGA to remain in effect while it is being amended. In the current situation, Kitsap County missed the deadline for compliance; therefore, Partners' application was submitted at a time the IUGA was no longer in effect because the period of remand had expired. Thus, the application had to vest to the preexisting rural 2.5 zoning.

For these reasons, we hold that the former Kitsap County Zoning Ordinance applies because the IUGA was not in effect at the time the completed application was submitted.

### Vesting

Partners argues that the project is vested to all land use regulations in effect at the time the application was filed, including the PUD ordinance. Br. of Appellants at 27.

---

[2] At the time the IUGA was first remanded, the GMHB had only the power to find that an IUGA did not comply with the GMA, not to void or invalidate the IUGA. *See* LAWS OF 1991, Spec. Sess., ch. 32, § 11. The Legislature amended the statute in 1995, giving the GMHB power to declare development regulations invalid and providing that "a finding of noncompliance and an order of remand shall not affect the validity of comprehensive plans and development regulations during the period of remand." RCW 36.70A.300(4); *see Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County*, 135 Wn.2d 542, 560-62, 958 P.2d 962 (1998). While these amendments give us some guidance in determining legislative intent, they do not directly affect this case.

Additionally, Partners contends a PUD is not a rezone because it was permitted under the PUD ordinance in effect in Kitsap County. Br. of Appellants at 36. Residents argues that the project did not vest to the regulations in effect at the time of filing because a PUD application is a request for a rezone. Br. of Resp'ts at 13-14. Residents posits that the application should "be judged in accordance with the laws in effect when final approval is given." Br. of Resp'ts at 14.

 This court has stated that "[i]n Washington, 'vesting' refers generally to the notion that a land use application, under the proper conditions, will be considered only under the land use statutes and ordinances in effect at the time of the application's submission." *Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 275, 943 P.2d 1378 (1997) (citing *Friends of the Law v. King County*, 123 Wn.2d 518, 522, 869 P.2d 1056 (1994); *Vashon Island Comm. for Self-Gov't v. State Boundary Review Bd.*, 127 Wn.2d 759, 767-68, 903 P.2d 953 (1995)). The issue then is whether the vested rights doctrine applies to an application that includes a PUD.[3] We hold that a preliminary plat application coupled with a PUD proposal creates a vested right to have the entire application, including the PUD, considered under the ordinances in effect at the time of filing.

RCW 58.17.033, also known as the "vested rights doctrine" states that:

(1) A proposed division of land, as defined in RCW 58.17.020, shall be considered under the subdivision or short subdivision ordinance, and zoning or other land use control ordinances, in effect on the land at the time a fully completed application for preliminary plat approval of the subdivision, or short plat approval of the short subdivision, has been submitted to the appropriate county, city, or town official.

(2) The requirements for a fully completed application shall be defined by local ordinance.

The statute does not specifically mention PUDs, so we must

---

[3] A PUD is essentially a mechanism which allows property owners the option of clustering or configuring lots in a plat to avoid development in sensitive areas, create open space, or achieve other environmental or aesthetic amenities.

determine whether this doctrine applies to preliminary plat applications coupled with PUD proposals. This court has addressed the issue of development of land, as opposed to merely dividing land, in the context of the vested rights doctrine. *See Noble Manor*, 133 Wn.2d at 274. Since a PUD is a land use technique that can be used to divide land as well as develop it, the *Noble Manor* reasoning is helpful here.

The issue in *Noble Manor* was whether filing a complete application for a short subdivision vests not only the right to divide the property but also "the right to *develop* the property under the land use and zoning laws in effect on the date of the application." *Id.* at 274 (emphasis added). This court concluded that when the vested rights doctrine was extended to plat applications, the intent was "to give the party filing an application a vested right to have *that application* processed under the land use laws in effect at the time of the application." *Id.* at 278. The vested rights doctrine applies to situations in which property is being developed, not merely divided.

Division One of the Court of Appeals has also held that when a preliminary plat application is coupled with a PUD application, the developer has a vested right in having all the ordinances in effect at the time of filing applied to the proposed development. *Schneider Homes, Inc. v. City of Kent*, 87 Wn. App. 774, 779, 942 P.2d 1096, 971 P.2d 56 (1997), *review denied*, 134 Wn.2d 1021, 958 P.2d 316 (1998). In *Schneider Homes*, the main issue was whether a completed application for a preliminary plat, which was inextricably linked to a PUD permit application and could not go forward without it, also vested in the developer the right to have the PUD permit application considered under the county ordinance in effect on the date the application was submitted. *Id.* at 778. The Court of Appeals held that "[t]he doctrine reflected in RCW 58.17.033 vests rights to develop, not merely divide the land." *Id.* The court recognized that a PUD application is only a proposed development for the land and not " 'in effect on the land.' " *Id.* (quoting RCW

58.17.033(1)). But the PUD ordinance at issue in *Schneider Homes* allowed the applicant to establish that the proposed PUD complied with applicable land use controls and other criteria. *Id.* at 780. If the PUD did comply, the County had to approve the preliminary PUD. *Id.*

Partners' preliminary plat and PUD proposal is similar to the one proposed in *Schneider Homes.* The PUD proposal determines what the configuration of lots will be if the plat is approved. As such, the preliminary plat application and PUD are inextricably linked. Because both are necessary to develop the property under the rule in *Noble Manor* and *Schneider Homes*, both vest to the laws in effect at the time the completed application was filed. *Noble Manor* applied the vested rights doctrine to the development of land. A PUD is a form of property development and, thus, when a preliminary plat application is coupled with a PUD proposal, the PUD ordinance is one of the laws in effect at the time of application to which the vested rights doctrine applies.

We affirm the Court of Appeals in part, holding that the preliminary plat and PUD proposal vested on the date of application. But we reverse the Court of Appeals' holding that the IUGA and GMA prevent approval of the application and hold that it must be considered under the former Kitsap County ordinances to which it vested on December 15, 1994.

### Environmental Concerns

The final issue is whether an EIS was required for the project. The trial court did not review the county commissioners' decision under the appropriate standard, and we therefore remand this case to the trial court to decide the issue under the correct standard.

The "clearly erroneous" standard applies to judicial review of an environmental decision by the county commissioners under SEPA. *See Cougar Mt. Assocs. v. King County*, 111 Wn.2d 742, 747-49, 765 P.2d 264 (1988); RCW

36.70C.130(1)(d).[4] A decision is clearly erroneous when the court is " 'left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 747 (some quotation marks omitted) (quoting *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 69, 578 P.2d 1309 (1978)). The court may not substitute its judgment for that of the decision-making body, but is to " 'examine the entire record and all the evidence in light of the public policy contained in the legislation authorizing the decision.' " *Cougar Mt. Assocs.*, 111 Wn.2d at 747 (quoting *Polygon*, 90 Wn.2d at 69).

The trial court in this case voided the County's approval of the project on the basis that it constituted "urban growth" outside of the designated IUGAs. Clerk's Papers at 356. The trial court went on to state that even if the project were approved, preparation of an EIS was required. Clerk's Papers at 368. The court reasoned that deference was due to the hearing examiner's conclusion that an EIS was warranted. Clerk's Papers at 367. Because the hearing examiner is not the final decision maker and only makes a recommendation to the county commissioners, the reviewing court must decide whether the county commissioners' decision that an MDNS was sufficient was clearly erroneous.

■ We would ordinarily apply " 'the same standard [the trial court used] directly to the administrative decision.' " *Norway Hill Preservation & Protection Ass'n v. King County Council*, 87 Wn.2d 267, 276, 552 P.2d 674 (1976) (quoting *Department of Ecology v. Ballard Elks Lodge*, 84 Wn.2d 551, 555, 527 P.2d 1121 (1974)). But here the trial court did not apply the proper standard. We therefore remand this case to the trial court for review, under the clearly erroneous standard, of the county commissioners' decision on the MDNS.

---

[4] When dealing with a LUPA petition, a court reviews the county commissioners' decision to issue an MDNS under any one of the standards set forth in RCW 36.70C.130(1). When the issue is whether the law was correctly applied to the facts, RCW 36.70C.130(1)(d) applies: "The land use decision is a clearly erroneous application of the law to the facts."

## CONCLUSION

We hold that the former Kitsap County zoning ordinances are the proper land use regulations to apply to Partners' development proposal. Because the IUGA had not been amended within the period of remand, the only land use regulations in effect were the preexisting zoning ordinances and, in the absence of adopted GMA plans or regulations, GMA policies cannot trump existing adopted land use regulations. The preliminary plat application coupled with the PUD proposal was an application to develop land. As such, both were vested to the laws in effect at the time of filing, i.e., applicable portions of the former Kitsap County zoning ordinances. The county commissioners concluded that the project is allowed under these ordinances, but we cannot reinstate their decision until the environmental concerns have been resolved. The trial court did not apply the correct standard of review when it determined that an EIS was required. We therefore remand this case to the trial court for review of the county commissioners' MDNS decision under the clearly erroneous standard.

SMITH, JOHNSON, ALEXANDER, SANDERS, and IRELAND, JJ., and AGID, J. Pro Tem., concur. MADSEN, J., concurs in the result.

TALMADGE, J. (dissenting) — I dissent because the majority so obviously errs in its characterization of the effects of interim urban growth areas (IUGAs) under the Growth Management Act (GMA). The majority frustrates legislative policy designed to prevent urban sprawl in an Evergreen State fast losing its green spaces to development.

The GMA became effective on July 1, 1990. As a county with more than 50,000 people, Kitsap County was required to enact a comprehensive plan under the GMA. LAWS OF 1990, 1st Ex. Sess., ch. 17, § 4(1). The GMA initially required counties to adopt such a comprehensive land use plan consistent with the Act's requirements by July 1, 1993. *Id.* § 4(2), (3); RCW 36.70A.040(1). The Legislature's first two stated goals for the GMA were to encourage develop-

ment in urban areas and reduce sprawl, by which it meant "the inappropriate conversion of undeveloped land into sprawling, low-density development." *Id.* § 2(1), (2); RCW 36.70A.020(1), (2). *See City of Redmond v. Central Puget Sound Growth Management Hearings Bd.*, 136 Wn.2d 38, 57, 959 P.2d 1091 (1998).

To achieve these goals, the GMA required planning counties to designate urban growth areas, as that term is defined in the Act. RCW 36.70A.110(1). The idea was to confine urban growth to these areas and not allow it to overrun surrounding undeveloped areas. The GMA specifically forbids urban growth outside the urban growth areas, stating counties must designate such areas in their comprehensive plans "within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature." *Id.*

When jurisdictions began having difficulty completing their comprehensive planning process by July 1, 1993, the Legislature extended the deadline by one year to July 1, 1994. Laws of 1993, 1st Spec. Sess., ch. 6, § 1(3). But in order to preserve undeveloped land from urban sprawl during the extension period the Legislature gave jurisdictions only until October 1, 1993 to designate IUGAs. *Id.* § 2(4). Kitsap County missed the statutory deadline and identified its IUGA on October 4, 1993. This case concerns Kitsap County's IUGA.

The crucial concern in this case—one the majority does not treat—is the effect of IUGA on development. The developers argue an IUGA is not a "development regulation" as that term is defined in the GMA. RCW 36.70A.030. Rather, their argument goes, a county must enact further, more specific ordinances to implement the IUGA, and the IUGA is therefore ineffective in and of itself to prevent growth outside its boundaries. The glaring flaw in this argument, however, is that the GMA itself describes an IUGA as a development regulation. RCW 36.70A.110(5). Aside from definitional niceties, there can be no question an interim urban growth boundary was to have the same

controlling, regulatory effect as the permanent urban growth boundary, i.e., to prevent urban growth in rural areas.

The majority leaps over the legal effect of the Kitsap County IUGA to focus on the central factual question here: what land use regulations were in effect when the developers applied for their planned unit development permit? Majority op. at 191. The majority correctly details the essential chronology:

| | |
|---|---|
| October 4, 1993 | Kitsap County identifies IUGA |
| June 3, 1994 | Growth Management Hearings Board (GMHB) determines IUGA is not in compliance with GMA, and remands to County for revision, ordering compliance by October 3, 1994. |
| October 3, 1994 | County ignores GMHB order and does not bring IUGA into compliance. |
| December 15, 1994 | Developers submit Planned Unit Development (PUD) application. |
| December 29, 1994 | Kitsap County amends IUGA. |

Quite obviously, unless something made it disappear, the IUGA was in effect on December 15, 1994, even though it was not fully in compliance with the GMA. Nevertheless, the majority concludes: "Because Kitsap County did not modify the IUGA until December 29, 1994, when it adopted a comprehensive plan pursuant to the GMA, the IUGA was not in effect at the time Partners submitted the completed application." Majority op. at 192.

But where did the IUGA go? The majority does not tell us.

Certainly there is nothing in the record to indicate Kitsap County rescinded its IUGA before December 15. Moreover, although the GMHB ruled the IUGA was not in compliance with the GMA, the GMHB did not have the authority in 1994 to declare the IUGA invalid. At that time, all a GMHB could do was find the regulation not in compliance and remand it to the issuing agency with an order to bring the regulation into compliance. RCW 36.70A.300(3)(b). The Legislature did not give the GMHBs power to invalidate development regulations until 1997. LAWS OF 1997, ch. 429, § 16; RCW 36.70A.302. *See Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County*, 135 Wn.2d 542, 560-62, 958 P.2d 962 (1998). Thus, neither the GMHB nor Kitsap County rescinded the IUGA in 1994. Therefore, though imperfect, the Kitsap County IUGA had the force of law when the developers applied for their permit on December 15, 1994. Despite that, the majority simply declares the IUGA expired without suggesting a single legal or logical reason why it did so.[5]

At its core, the majority's position makes no sense in light of the history and purpose of the GMA and is diametrically opposed to the intent of the people of Washington. The Legislature intended IUGAs to *prevent* urban sprawl during the planning grace period the 1993 Legislature conferred on counties. The plain effect of the majority opinion is to *permit* urban sprawl and reward county recalcitrance in complying with the terms of the GMA. Clearly, the majority decision is result-oriented. In light of the clear purpose and history of the GMA and IUGAs, and the majority's refusal to give effect to the law, the majority would do better to issue a two-sentence per curiam opinion that says: "We don't like the Growth Management Act. The developers win."

The developers' PUD application for 106 single family

---

[5] In fact, the majority illustrates the utter illogic of its conclusion by saying Kitsap County *modified* the IUGA on December 29, 1994. If the IUGA did not exist on December 15, 1994, when the developers applied for their permit, there was plainly nothing to modify on December 29.

lots on 123 acres constituted urban development outside Kitsap County's designated interim urban growth area. The planned PUD is therefore in violation of the GMA. I would affirm the Court of Appeals.

Motions for reconsideration denied November 1, 2000.