[Nos. 18743-8-III; 18747-1-III;    Division Three.    July 3, 2001.]
18759-4-III; 18776-4-III;
18809-4-III; 19063-3-III.

THE STATE OF WASHINGTON, *Respondent*, v. ARMANDO MAYORGA DeSANTIAGO, ET AL., *Appellants*.

THE STATE OF WASHINGTON, *Appellant*, v. ARMANDO MAYORGA DeSANTIAGO, ET AL., *Respondents*.

856

860

*Antonio Salazar* and *Russell R. Abrutyn*, for appellants DeSantiago, et al.

*John D. Knodell, Prosecuting Attorney*, for respondent State.

KURTZ, C.J. — After two trials, Armando DeSantiago, Enrigue DeSantiago, Pedro Caranza, Victor Diaz, and Elpidio Reyes were convicted of first degree kidnapping. The jury returned special verdicts finding that the defendants were armed with a deadly weapon and a firearm at the time of the kidnapping. Three issues are raised in this consolidated appeal. First, did the court err by admitting the prior testimony of three witnesses based on their unavailability at the time of the second trial? Second, did the court err in allowing additional charges to be filed shortly before the second trial? Third, did the court improperly sentence four of the defendants to consecutive firearm and deadly weapon enhancements when there was only one predicate offense?

We conclude that the court properly admitted the prior testimony of the three witnesses under ER 804(b)(1). We further conclude that the trial court did not abuse its discretion by allowing the amendment of the criminal information to add additional criminal charges because the amendments did not prejudice the substantial rights of the defendants. Finally, we conclude that the court erred by imposing sentence enhancements for both the deadly weapon and the firearm.

## FACTS

Armando DeSantiago, Enrigue DeSantiago, Victor Diaz, Pedro Caranza, and Elpidio Reyes were charged with first degree kidnapping based on events occurring between February 19-22, 1999. The first trial ended in a mistrial. Prior to the second trial, additional charges were filed, including charges of first degree burglary. Days before the start of the second trial, the State informed the court that it was unable to locate three witnesses and that the State would seek to offer their testimony from the first trial pursuant to ER 804. At a hearing on this issue, the court determined that the witnesses were unavailable and admitted the former testimony.

The following testimony—consisting of former testimony—was introduced at the second trial from the three witnesses who were found to be unavailable.

*Testimony of Eduardo Sanchez.* Mr. Sanchez testified that at the time of the incident, he lived in a trailer in Othello, Washington, with his wife, Reina Serrano, and their infant son. Silviano Ruiz was also staying with them and had moved into the trailer two weeks before. On the evening of February 19, 1999, Mr. Sanchez was home with his wife and child. Shortly after midnight, the family left the trailer to get some medicine for Ms. Serrano, who was having a headache. When they returned to the trailer, they observed a man in a parked car. As they approached their trailer, they were confronted by three other men. One man

told Mr. Sanchez to get out of the car. When Mr. Sanchez refused, three men took him out of the car and put a pistol and a knife to him. Mr. Sanchez was placed in the other vehicle while his wife remained in his car. Mr. Sanchez was then taken to a motel room where he was held for two days and two nights.

Mr. Sanchez identified the four men who took him as Mr. Reyes, Mr. Caranza, Mr. Diaz, and Enrigue DeSantiago. The men told Mr. Sanchez that they were looking for Silviano Ruiz because he owed them money. Mr. Sanchez was told he would be killed or hurt if he tried to escape. Mr. Sanchez stated that his kidnappers were armed with a gun and a knife. He further stated that, at different times, Armando DeSantiago, Enrigue DeSantiago, and Mr. Caranza held the gun. Mr. Reyes was the one who had the knife. The men made several telephone calls and allowed Mr. Sanchez to tell his family that he was fine. The men spoke to Ms. Serrano. Mr. Sanchez heard the men ask for money during some of the telephone calls.

After two days and two nights, the five men drove Mr. Sanchez to Moses Lake and parked near a Burger King. On the way, one of the men called Mr. Sanchez's father, Jose Sanchez, on a cell phone. While parked at the Burger King, Jose Sanchez appeared and came toward the car. Eduardo Sanchez was allowed to get out of the car and was later taken to the police station.

*Testimony of Reina Serrano.* Ms. Serrano corroborated Mr. Sanchez's story concerning the events outside their trailer shortly after midnight on February 20. Ms. Serrano testified that a number of men came around the trailer and pulled Mr. Sanchez out of the car; one of the men put a pistol to her husband's neck. But, Ms. Serrano saw no weapons other than the gun. When Ms. Serrano went back in the trailer, she noticed damage that was not there before, including some cut telephone wires and some pictures that had fallen down; there were also open cans of soda in the kitchen. Ms. Serrano spoke to police and later received a telephone call from her husband in which he told her that

he was okay. Ms. Serrano stated that she continued to live with Jose Sanchez until the time of the (first) trial.

*Testimony of Jose Sanchez.* Jose Sanchez testified that Ms. Serrano came to his house on the day that his son was kidnapped. Once she arrived, she continued to stay at his house. According to Jose Sanchez, the police contacted him at his house and his son called to say that he was okay. Jose Sanchez later received a telephone call informing him that his son had been taken because Mr. Silviano owed money to the men. At first, Jose Sanchez was told that the men wanted 23 pesos, which he interpreted to mean $23,000. In later calls, he was told to try to get $11,000 and the rest he could pay later. The police told Jose Sanchez to tell the men to come and get the money in Moses Lake. The men agreed to meet in Othello and said they wanted $11,000 before they would hand over Mr. Sanchez. Later, it was agreed that they would meet on the outskirts of Moses Lake.

Jose Sanchez went to the agreed-upon location, turned over the money, and his son was released. On cross-examination, Jose Sanchez admitted that he did not know who was talking on the telephone and could not identify the person or persons by name. He also could not identify any of the men he saw at the Moses Lake exchange location as being one of the defendants.

The following testimony was obtained from witnesses who testified at the second trial.

*Testimony of Silviano Ruiz.* Mr. Ruiz testified that prior to this incident, he knew all of the defendants except for Mr. Caranza and Mr. Reyes. Mr. Ruiz stated that he worked as a driver for the DeSantiagos and Mr. Diaz, and was paid $1,000 on each occasion that he delivered a car to Pasco from California. Mr. Ruiz did not know what was in the cars but on one occasion he saw Armando DeSantiago, Enrigue DeSantiago, and Mr. Diaz put the car in the garage and start taking off the doors. Mr. Ruiz was given a car to drive from California in January 1999, but the car broke down near Weed, California. Mr. Ruiz left the car on the side of the road and called the DeSantiagos. They told him to go

back to the car. When he refused, they told him things would go badly for him if he did not go back. Mr. Ruiz returned to California because he was afraid to go back to the car. He stayed in California for one or two weeks, but returned to Washington and moved in with Eduardo Sanchez and Reina Serrano after being introduced to the family by his cousin.

Mr. Ruiz also testified as to his contacts with police after Mr. Sanchez's abduction. At one point, Mr. Ruiz spoke to Mr. Diaz and Armando DeSantiago and was told they wanted money.

*Testimony of Police Officers.* Police were contacted immediately after the alleged abduction. Several officers testified as to their involvement in the investigation, the interception and recording of telephone conversations, the steps to obtain the prerecorded "buy money," the surveillance activities at the exchange location, and the felony stops of the defendants' cars after Mr. Sanchez was released. Felony stops were conducted on two cars, a white Caprice and a Honda, and the five defendants were taken into custody. A Colt .45 caliber pistol was recovered from the rear seat of the Honda. The prerecorded police buy money was recovered from a sack on the right front passenger floor of the Honda. A thin-bladed knife was removed from Mr. Reyes.

*Testimony of Enrigue DeSantiago.* Mr. DeSantiago testified that he met Eduardo Sanchez in December 1998. Mr. DeSantiago next saw Mr. Sanchez on the night of February 19, 1999, when Mr. DeSantiago gave Victor Diaz, Elpidio Reyes, and Pedro Caranza a ride to Moses Lake and they went to the Sanchez trailer. Mr. Diaz knocked at the door but returned to the car when no one answered. A short time later, another car drove up and Mr. Diaz got out of his car, walked over and talked to what appeared to be friends of his. Mr. Diaz returned to the car and brought Mr. Sanchez with him; Mr. Diaz stated that Mr. Sanchez was going to help them look for his brother, Jorge Sanchez. They stopped and got beer and gas before returning to the Tri-Cities. In the Tri-Cities, Mr. Diaz suggested that they get a hotel

room where they talked and drank beer until 2:30 A.M.

Mr. DeSantiago returned to the hotel the next day; everyone was talking, drinking, and watching television. He returned to the hotel room a second day, Sunday, February 21. During this time, he let Mr. Diaz use his cell phone. Mr. DeSantiago returned to the hotel room Sunday evening. Monday morning, Mr. Diaz asked Mr. DeSantiago for a ride to Moses Lake so that Mr. Diaz could be paid some money he was owed for a pickup truck. Mr. DeSantiago asked his brother to drive Pedro Caranza and Eduardo Sanchez to Moses Lake. Mr. Diaz drove another car and Mr. Reyes was with Mr. Diaz. In Moses Lake, they went to a store to get cigarettes and were met by Jose Sanchez. Eduardo Sanchez said that his father would give the money or the title to Mr. DeSantiago when he got out of the car. After they received the money, they returned to the highway but were stopped by police. Mr. DeSantiago had never seen the .45 caliber pistol that was recovered from the Honda. He had seen a knife on a table at the hotel; the knife was used to cut lemons for drinking beer.

*Testimony of Victor Diaz.* Mr. Diaz testified that he had purchased a pickup truck from Jorge and Eduardo Sanchez, but that he was going to return the truck and get his money back unless the Sanchezes gave him the title. Mr. Diaz paid $12,500 for the pickup but did not get the title. Jorge Sanchez was in Montana and told Mr. Diaz that he would give the money to his father to give to Mr. Diaz. Mr. Diaz never threatened any member of the Sanchez family to get either the money or the title.

*Verdict and Sentence.* At the end of the second trial, all five defendants were found guilty of first degree kidnapping. The jury returned special verdicts finding that the defendants were armed with a knife and a firearm at the time of the kidnapping. Mr. Reyes, Mr. Diaz, and Mr. Caranza were also found guilty of first degree burglary. Armando DeSantiago was found guilty of unlawful possession of a firearm in the second degree. After Armando DeSantiago's prior convictions were dismissed, an amended

judgment and sentence was filed finding him guilty of first degree kidnapping. Four of the defendants—Mr. Diaz, Mr. Reyes, Enrigue DeSantiago, and Mr. Caranza—were sentenced to two consecutive enhancements, one for the firearm and one for the knife. Armando DeSantiago was sentenced to the lowest sentence of the standard range with only a firearm enhancement. All defendants appealed. The cases were linked and consolidated on appeal.

## ANALYSIS

### Admissibility of Former Testimony

The defendants contend the court erred by allowing the testimony of the victim and two family members because the State failed to establish that these witnesses were unavailable for purposes of ER 804(a)(5) and the Sixth Amendment. The defendants assert the State failed to properly serve these witnesses and did not exercise due diligence in attempting to locate them. The defendants also maintain that the State failed to notify defense counsel when it became aware that the witnesses might be unavailable. Moreover, the defendants assert the State could have filed for a continuance once the State had some indication as to the whereabouts of these witnesses.

■ ■ The admissibility of a hearsay statement in a criminal case is governed by ER 804(b)(1) and the limitations imposed by the defendant's Sixth Amendment right of confrontation. *State v. Rivera*, 51 Wn. App. 556, 558, 754 P.2d 701 (1988). ER 804(b)(1) prohibits the admission of former testimony unless the proponent of the former testimony demonstrates that the declarant is "unavailable as a witness." ER 804(a)(5) provides that a witness is "unavailable" if the witness is "absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance . . . *by process or other reasonable means*." (Emphasis added.) When applying ER 804, Washington courts have generally held that the prosecution must use all available means to compel the witness's presence at

trial. *State v. Hobson*, 61 Wn. App. 330, 336, 810 P.2d 70 (1991).

Even though a hearsay statement may be admissible under ER 804, the statement may be inadmissible under the more stringent constitutional standard. *Rivera*, 51 Wn. App. at 559. The confrontation clause requires that the prosecution demonstrate that it made a good faith effort to obtain a witness's presence at trial. *Hobson*, 61 Wn. App. at 336; *Rivera*, 51 Wn. App. at 559 (citing *Barber v. Page*, 390 U.S. 719, 724-25, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968)). " 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' " *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980) (quoting *California v. Green*, 399 U.S. 149, 189 n.22, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)). "[T]he ultimate question is whether the witness is unavailable despite good faith efforts undertaken prior to the trial to locate and present that witness." *State v. Goddard*, 38 Wn. App. 509, 512, 685 P.2d 674 (1984).

To resolve the issue here, we must answer two questions. First, does the former testimony of Eduardo Sanchez, Reina Serrano, and Jose Sanchez (Sanchez family) fall within one of the recognized exceptions to the hearsay rule as defined by ER 804? Second, if so, did the admission of this testimony violate the reasonableness standard of ER 804 or the good faith standard established to protect a defendant's right to confrontation?

*"Former Testimony" Exception under ER 804(b)(1).* ER 804(b)(1) reads as follows:

> *Former Testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The defendants contend the testimony from the first trial

does not fall within the hearsay exception for former testimony set forth in ER 804(b)(1) because they were charged with additional charges in the second trial. The defendants cite no cases to support this argument and there is no support for this argument in ER 804(b)(1), which encompasses testimony given "at another hearing of the same or a different proceeding." The testimony in question here falls within the exception to the hearsay rule set forth pursuant to ER 804(b)(1).

*"Unavailability" of the Witnesses.* The first trial ended in a mistrial. At the time of the first trial, the Sanchez family lived together at the residence of Jose Sanchez. The State concedes that these three witnesses had expressed misgivings about testifying prior to the first trial. One officer testified that these witnesses told him that they were afraid of retaliation by the DeSantiagos and were planning to leave the area. But the three witnesses did not leave the area and agreed to stay at the request of Detective David Matney and the prosecutor. The State effected service in the first trial by mailing subpoenas to these three witnesses. With the exception of Ms. Serrano, the witnesses signed and returned the subpoenas. The prosecutor stated that under the State's procedure, a signed, returned subpoena was considered the equivalent of personal service. Regardless, all three witnesses appeared at the first trial even though none was personally served with a subpoena.

On May 17, the court reset the trial date. On May 24, the prosecutor's office mailed subpoenas to each of the three witnesses. On May 27, Miss Rubio of the prosecutor's office received a telephone message indicating that the three witnesses had moved to Texas.[1] This call apparently came from a Sanchez relative who had received the Sanchezes' mail. The prosecutor's office then referred the matter to the sheriff's office.

The prosecutor's office contacted Detective Matney on June 5 or 6. Detective Matney spoke to a member of the

---

[1] Apparently the second trial was originally set for May 28, but was then reset for June 9 and then reset again for June 29.

Sanchez family who told him that the three witnesses had moved out of their home and gone to Mexico. This individual refused to be interviewed until receiving assurances that his/her name would not be made public in court. Officers had contact with this particular family member on at least four occasions. Each time, the person told officers that the three witnesses were in Mexico. The individual also indicated that s/he knew the residence the Sanchez family was moving to in Mexico, but the family member would not disclose the name of the town or the address and there were no telephones in the area. The family member also told officers that the Sanchez family planned to move to Texas where they would contact a relative. The family member refused to disclose the name or telephone number of this relative because the family member was afraid. The family member also told officers that the Sanchez family did not feel safe after the first trial. An officer went to the Sanchez house and determined that the witnesses had moved away. Detective Matney testified that he had no contact with the Sanchez family after the first trial ended and he had no advance notice that the family would be leaving.

Silviano Ruiz testified at the pretrial hearing as to admissibility of the former testimony. Mr. Ruiz had been arrested as a material witness. While in jail, Mr. Ruiz telephoned Mr. Sanchez. Mr. Ruiz testified that Mr. Sanchez said that he was scared and that he was going to leave. The next day, Mr. Ruiz attempted to call Mr. Sanchez a second time but the phone had been disconnected.

*Inapplicability of "Due Diligence" Standard.* The defendants contend the former testimony should have been excluded because the State failed to establish that the witnesses were unavailable for purposes of ER 804(a)(5) and the Sixth Amendment. The defendants contend unavailability cannot be established unless the State can show "due diligence" which requires the proper issuance of a subpoena to a witness. According to the defendants, a witness is not "unavailable" under ER 804(b)(1) unless the

State attempted to personally serve the witness with a subpoena. To support this argument, the defendants rely on *State v. Adamski*, 111 Wn.2d 574, 761 P.2d 621 (1988), *State v. Duggins*, 121 Wn.2d 524, 852 P.2d 294 (1993), *State v. Nguyen*, 68 Wn. App. 906, 847 P.2d 936 (1993), and *State v. Jackman*, 113 Wn.2d 772, 783 P.2d 580 (1989).

The defendants' "due diligence" argument is without merit. The due diligence standard is applied when determining whether a continuance should be granted during the speedy trial period. The cases cited by the defendants—*Adamski*, *Duggins*, *Nguyen*, and *Jackman*—discuss speedy trial rights, not ER 804 and the confrontation clause. Moreover, nothing in ER 804 requires personal service of a subpoena. ER 804(a)(5) states that a witness is unavailable if "the proponent of the statement has been unable to procure the declarant's attendance . . . by process *or* other reasonable means." (Emphasis added.) This makes sense. It stands to reason that an "unavailable" witness may not be subject to process.

*Application of the ER 804(b)(1) Standard.* The defendants next argue that even though ER 804(b)(1) does not require personal service of a subpoena, cases applying the rule suggest that process is required because the State is required to use all available means to obtain the witness's presence. To support this argument, the defendants rely on *State v. Aaron*, 49 Wn. App. 735, 745 P.2d 1316 (1987), *State v. Sweeney*, 45 Wn. App. 81, 723 P.2d 551 (1986), *State v. Hobson*, 61 Wn. App. 330, 810 P.2d 70 (1991), and *State v. Rivera*, 51 Wn. App. 556, 754 P.2d 701 (1988). These cases are distinguishable.

The *Aaron* court concluded a witness was not unavailable for purposes of ER 804 where the State made no showing that it made any attempt to contact a witness known to be in England. *Aaron*, 49 Wn. App. at 745. In *Rivera*, the court concluded a witness was not unavailable where the witness had been served, failed to appear, and the prosecutor made no effort to inquire as to her whereabouts. *Rivera*, 51 Wn. App. at 560-61. In *Sweeney*, the witness had been served

with a subpoena before she left for California. The prosecutor spoke to the witness by telephone and made plane reservations for her to return, but the witness refused to come to Washington and testify. *Sweeney*, 45 Wn. App. at 84-85. The court concluded the witness was not unavailable because the State made no attempt to procure her presence by using the uniform act, chapter 10.55 RCW. *Id.* at 85-86. In contrast, the *Hobson* court concluded that a witness was unavailable because a material witness warrant was not required to obtain the presence of a witness whose testimony was supported by other witnesses and who would suffer hardship in the form of a forfeited hunting trip if forced to testify. *Hobson*, 61 Wn. App. at 337-38.

These cases demonstrate that personal service of a subpoena is one of several factors considered when determining whether reasonable effort has been made to obtain the presence of a witness. For example, the *Sweeney* court noted that the State was not required to use the uniform act to compel the presence of the out-of-state witness until it became apparent that the witness was uncooperative. *Sweeney*, 45 Wn. App. at 86. Similarly here, the prosecutor had no obligation to resort to employing all available means to obtain the presence of the Sanchez family until he became aware that they had decided not to testify. Unfortunately here, unlike *Sweeney*, once the prosecutor discovered that the Sanchezes did not want to testify, they were already out of the country at an undiscoverable location.

To a large extent, the unknown whereabouts of the Sanchez family distinguishes this case from cases such as *Sweeney*, *Hobson*, and *Aaron*. In each of these cases, the State knew the whereabouts of the reluctant witness, but failed to use available legal means to obtain the witness's presence. Here, the State did not know the whereabouts of the Sanchez family; hence, the State was limited in the means available to obtain their return. In short, the State used all reasonable legal means to obtain the presence of the Sanchez family.

*Application of the Sixth Amendment Standard.* Even if

we assume that the State used all reasonable means to obtain the presence of the Sanchez family, we must still consider whether the State made a good faith effort to compel their presence at trial. The *Sweeney* and *Aaron* courts based their decisions on the application of ER 804. The *Hobson* and *Rivera* courts applied the constitutional standard in addition to the reasonableness standard of ER 804. Relying on *Hobson*, the defendants suggest that the constitutional standard requires the State to create a record showing personal contact with the uncooperative witness. Relying on *Rivera*, the defendants suggest that a showing of mere absence from the state is insufficient to satisfy the requirements of the confrontation clause. In short, the defendants imply that even if the Sanchez family had left the country, the State must demonstrate some personal contact with the Sanchez family in order to establish good faith.

But the *Hobson* court did not base its decision on the lack of personal service. The *Hobson* court stated that a determination of good faith must be made according to the particular facts of each case. *Hobson*, 61 Wn. App. at 336. Examining the facts, the *Hobson* court determined that there was little more the prosecution could have done to procure the witness's presence at trial. *Id*. at 338. Similarly, the *Rivera* court examined the facts and reached a different conclusion. In *Rivera*, the prosecution's only effort in obtaining the witness's attendance was the issuance of a subpoena. The *Rivera* court concluded that the State could not claim good faith based solely on the issuance of the subpoena but must prove the witness's unavailability with certainty. *Rivera*, 51 Wn. App. at 561.

Here, the State demonstrated that the Sanchez family was unavailable to testify and the State made a good faith attempt to locate the family. These witnesses had expressed reservations about testifying at the first trial, but they did not leave and testified at the request of the prosecutor and Detective Matney. When the second trial was set, the prosecutor mailed subpoenas to the witnesses following the

same procedure used prior to the first trial. By the time the prosecutor learned of a problem, the Sanchez family was already in Mexico. Officers attempted to obtain information from a member of the Sanchez family, but learned that the witnesses were in Mexico. A review of this record indicates that the State met the reasonableness standard of ER 804 and the good faith requirement of the confrontation clause.

*Failure to Notify Defense Counsel or Request a Continuance.* The defendants contend that even if unavailability was demonstrated under ER 804 and the confrontation clause, the testimony was inadmissible because the State failed to inform the defense and request a continuance. The defendants rely on *Rivera* and *State v. McPherson*, 64 Wn. App. 705, 829 P.2d 179 (1992). *McPherson* is inapplicable here. *McPherson* discusses "due diligence" in the context of speedy trial rights and discusses the need to inform the defense that a witness is leaving so that testimony can be preserved. *Id.* at 708-09.

The *Rivera* court—when applying both ER 804 and the "good faith" constitutional standard—noted that the trial court reserved its ruling on unavailability and granted a three-day continuance, but that the State made no attempt to use this opportunity to locate the witness. Hence, *Rivera* does not support the argument that the State must ask for a continuance whenever a witness is unavailable. Moreover, the facts in *Rivera* indicate that the trial court granted the continuance because there was some evidence indicating that the police had some knowledge as to the witness's whereabouts because the witness had called the police from Ellensburg a week before the trial. *Rivera*, 51 Wn. App. at 561. Here, there is no evidence that a continuance would have helped the State locate the Sanchez family.

We conclude the court did not err by admitting the former testimony of Eduardo Sanchez, Reina Serrano, and Jose Sanchez.

### Additional Charges

The charges against the defendants resulted from conduct that allegedly occurred between February 19-22, 1999. All of the defendants were arrested no later than February 22 and remained in custody until sentencing. On June 1, prior to the second trial, the State filed additional charges against each defendant. The defendants contend the amendment of the information violated CrR 3.3(c)(1) because the speedy trial period for the additional charges expired no later than March 2 and the delay was not excused by a showing that the State acted in good faith and exercised due diligence.

We review a trial court's grant of a motion to amend for abuse of discretion. *State v. Brett*, 126 Wn.2d 136, 155, 892 P.2d 29 (1995). Generally, the court may allow amendment of a criminal charge at any time before verdict, provided the amendment does not prejudice the substantial rights of the defendant. CrR 2.1(d); *State v. Pelkey*, 109 Wn.2d 484, 490-91, 745 P.2d 854 (1987). These substantial rights include the right to effective representation by counsel and the right to a speedy trial. *State v. Earl*, 97 Wn. App. 408, 410, 984 P.2d 427 (1999). "The defendant has the burden of showing prejudice." *State v. Guttierrez*, 92 Wn. App. 343, 346, 961 P.2d 974 (1998). In this context, the fact that the defendant does not request a continuance is persuasive of lack of surprise or prejudice. *State v. Brown*, 55 Wn. App. 738, 743, 780 P.2d 880 (1989). But "[f]ailure to comply with the speedy trial rule requires dismissal, regardless of whether the defendant can show prejudice." *Earl*, 97 Wn. App. at 410.

The defendants contend the amendment of the information violated their right to a speedy trial pursuant to CrR 3.3(c)(1). However, the defendants do not argue that the second trial occurred outside the speedy trial period applicable to the initial charges. The 60-day speedy trial period for defendants in custody begins to run at arraignment, but the period of a continuance is excluded from the

speedy trial period. CrR 3.3(c)(1), (g)(3); *State v. Pettus*, 89 Wn. App. 688, 701, 951 P.2d 284 (1998). "[W]hen multiple crimes arise from the same criminal episode, the time within which trial must begin on all crimes is calculated from the time that the defendant is held to answer any charge with respect to that episode." *State v. Ross*, 98 Wn. App. 1, 5, 981 P.2d 888, 990 P.2d 962 (1999), *review denied*, 140 Wn.2d 1022 (2000). Here, the additional charges were added within the speedy trial period and the applicable speedy trial period did not expire before the trial commenced.

The defendants rely primarily on *Earl*, *Ross*, and *State v. Harris*, 130 Wn.2d 35, 921 P.2d 1052 (1996) to support their argument that the additional charges must be dismissed. These cases are distinguishable. In *Ross* and *Harris*, the initial charges were resolved before the additional charge was filed. *Harris*, 130 Wn.2d at 36-37; *Ross*, 98 Wn. App. at 5-6.

In *Earl*, the State moved to amend an information on the day of trial to add a new count of first degree child rape involving a different victim. *Earl*, 97 Wn. App. at 410-11. Mr. Earl objected arguing that he was entitled to: (1) fair notice of the charges, (2) a speedy trial, and (3) an adequately prepared defense. *Id.* at 410. The trial court then allowed amendment. Mr. Earl moved for a continuance and signed a speedy trial waiver. The court granted a three-week continuance. The *Earl* court concluded that the last continuance did not toll the speedy trial clock because the amendment to the information compelled Mr. Earl to choose between the right to effective representation and his right to a speedy trial. *Id.* at 414. The *Earl* court concluded that: " 'When the State, without excuse, delays filing an amended information until a point when this action will compel the defendant to seek a continuance, the resulting period of delay is not excluded in calculating the time elapsed before trial under CrR 3.3.' " *Id.* (quoting *State v. Ralph Vernon G.*, 90 Wn. App. 16, 21, 950 P.2d 971 (1998)).

Here, the defendants did not object to the amendment

based on the violation of their speedy trial rights, nor did they request a continuance. The defendants have failed to establish any prejudice to their substantial rights; their speedy trial rights were not violated when additional charges arising out of the same criminal episode were tried within the speedy trial period applicable to the initial charges. The court did not abuse its discretion by allowing the motion to amend.

The jury here convicted all five defendants of first degree kidnapping and returned special verdicts finding that the defendants were armed at the time of the kidnapping with a firearm and with a deadly weapon other than a firearm. At sentencing, the trial court imposed consecutive sentence enhancements—60-month sentence enhancements for the firearm and 24-month enhancements for the deadly weapon. Armando DeSantiago was later resentenced after his prior convictions were dismissed. When resentenced, the court imposed the lowest sentence of the standard sentence range with only a firearm enhancement.

## Sentence Enhancements

The defendants contend that the court erred by imposing sentence enhancements for both the knife and the firearm. Alternatively, they contend that even if two enhancements were proper, these enhancements must run concurrently rather than consecutively. The State contends that the applicable statutes required the court to impose two consecutive enhancements, one firearm enhancement and one deadly weapon enhancement.

Under the Sentencing Reform Act of 1981, a sentencing court engages in a three-part process. First, the court calculates a standard range by applying the defendant's offender score with the seriousness level of a crime. Second, the court adds any enhancements to a given sentence base. Finally, the court applies RCW 9.94A.400 to determine whether the sentences run concurrently or consecutively. *In re Post Sentencing Review of Charles*, 135 Wn.2d 239, 254, 955 P.2d 798 (1998).

This consolidated appeal presents both sides of the same question, but the opposing parties frame the issue in different ways. The defendants contend the court erred by imposing consecutive enhancements because the court could not impose two enhancements for one predicate offense. This argument focuses on the court's authority during the second part of the sentencing process when the court determines whether to add any enhancements. The State takes the position that the court had the authority to impose two enhancements and argues that the unambiguous language of RCW 9.94A.310(3)(e) and (4)(e) requires that all enhancements run consecutively. By necessity, the State's argument glosses over the second step in the sentencing process and focuses on the determinations made in the third step of the sentencing process. In short, the parties argue past each other—the defendants contend one enhancement was proper instead of two and that even two enhancements must run concurrently; the State contends the two enhancements must run consecutively.

■ *One Enhancement or Two?* The court applies a sentencing enhancement during the second step in the sentencing process. A sentencing enhancement is added to the base sentence to reach a single presumptive sentence for a particular offense. *Charles*, 135 Wn.2d at 254. Significantly, a sentence enhancement is not a separate sentence but a "statutorily-mandated increase to an offender's sentence range because of a specified factor in the commission of the offense." *Id.* at 253 (citing WASH. SENTENCING GUIDELINES COMM'N, ADULT FELONY SENTENCING app. G, at G-1 (1996)). "Traditional sentencing factors often involve either characteristics of the offender, such as recidivism, or special features of the manner in which a basic crime was carried out (*e.g.*, that the defendant abused a position of trust or brandished a gun)." *Castillo v. United States*, 530 U.S. 120, 126, 120 S. Ct. 2090, 147 L. Ed. 2d 94 (2000).

■ An act creating a sentence enhancement does not create a new crime. *State v. Thorne*, 129 Wn.2d 736, 779,

921 P.2d 514 (1996). This distinction is significant. For example, because a sentence enhancement is not a separate sentence, a defendant does not have a constitutional right to a jury determination of fact relating to the enhancement even when the sentence enhancement turns on specific findings of fact. *State v. Meggyesy*, 90 Wn. App. 693, 709, 958 P.2d 319 (1998). However, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

▮▮▮▮ Prior to 1995, there was only one deadly weapon enhancement based on the definition contained in RCW 9.94A.125, and firearms were included in the definition of a deadly weapon for purposes of the enhancement. *See* Laws of 1995, ch. 129, § 2. In 1995, the Legislature enacted Initiative 159, entitled "Hard Time for Armed Crime Act." Laws of 1995, ch. 129; *Charles*, 135 Wn.2d at 246. "Initiative 159 'split the previous deadly weapon enhancement into separate enhancements for firearms and for other deadly weapons, and broadened their application to all felonies except those in which using a firearm is an element of the offense.'" *State v. Brown*, 139 Wn.2d 20, 25, 983 P.2d 608 (1999) (quoting Wash. Sentencing Guidelines Comm'n, Adult Sentencing Guidelines Manual cmt. at II-67 (1997)).

The new law increased the sentence enhancement when the offender or an accomplice is found to have been armed with a firearm or deadly weapon during the commission of an offense. *Charles*, 135 Wn.2d at 246. The Hard Time Act's purpose, in part, was to "[d]*istinguish between* the gun predators and criminals carrying other deadly weapons and *provide greatly increased penalties for gun predators* and for those offenders committing crimes to acquire firearms." Laws of 1995, ch. 129, § 1(2)(c) (emphasis added).

RCW 9.94A.310(3) contains the provisions related to the "firearm enhancement" and RCW 9.94A.310(4) contains the provisions related to the "deadly weapon enhancement." All

of RCW 9.94A.310(3) and portions of .310(4) were submitted to the Legislature as part of Initiative 159. LAWS OF 1995, ch. 129.

RCW 9.94A.310(4) provides for various enhancements, depending on the class of the crime, "if the offender or an accomplice was armed with a deadly weapon as defined in this chapter *other than a firearm* as defined in RCW 9.41.010." (Emphasis added.) A deadly weapon is defined in RCW 9.94A.125 as:

> For purposes of this section, a deadly weapon is an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death. The following instruments are included in the term deadly weapon: Blackjack, sling shot, billy, sand club, sandbag, metal knuckles, any dirk, dagger, pistol, revolver, or any other firearm, any knife having a blade longer than three inches, any razor with an unguarded blade, any metal pipe or bar used or intended to be used as a club, any explosive, and any weapon containing poisonous or injurious gas.

Hence, a firearm is included in the statutory definition contained in RCW 9.94A.125, but excluded from the deadly weapon definition for purposes of the deadly weapon enhancement under RCW 9.94A.310(4).

When compared to the provisions of RCW 9.94A.310(4), RCW 9.94A.310(3) provides for relatively longer enhancement periods "if the offender or an accomplice was armed with a firearm as defined in RCW 9.41.010." For purposes of the enhancement, a firearm is defined as "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." RCW 9.41.010(1). The issue here is whether defendants armed with a knife and a gun can receive two enhancements for the same predicate offense.

The interpretation of a statute is a question of law, reviewed de novo. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 555, 14 P.3d 133 (2000). The primary goal of interpreting a statute is to

ascertain and give effect to the intent of the Legislature. *Id.* (citing *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999)). To determine the intent, we look to the plain words. *Id.* However, we are required to read legislation as a whole and determine intent from more than just a single sentence; effect should be given to all of the language used and provisions must be considered in relation to each other and harmonized to ensure proper construction. *Id.* at 560 (citing *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 91 Wn. App. 1, 16, 951 P.2d 1151 (1998), *aff'd in part, rev'd in part*, 138 Wn.2d 161, 979 P.2d 374 (1999).

▮▮▮ The State assumes RCW 9.94A.310(3) and (4) establish two separate enhancements that may be applied to the same predicate crime. Even though the language of subsections 3 and 4 establishes a "firearm enhancement" and a "deadly weapon enhancement," these enhancements are added because of a single characteristic of the underlying crime, i.e., whether or not the defendant or an accomplice was "armed." Nothing in either subsection 3 or subsection 4 implies that additional time should be added based on the number of firearms or the number of deadly weapons. An enhancement is required whenever it is established that "the offender or an accomplice" was armed with "a" firearm or "a" deadly weapon. This limited inquiry stands in sharp contrast to the calculation of an offender score, a clearly defined process that enhances a sentence by taking into account prior convictions. *See* RCW 9.94A.360.

Because the plain words of RCW 9.94A.310(3) and (4) demonstrate an intent to add an enhancement based on whether any of the offenders is armed, the provisions must be read to impose either a deadly weapon enhancement or a firearm enhancement, but not both, when only one offense is committed with both a deadly weapon and a firearm. Impermissible "double counting" occurs when a court imposes two upward enhancements premised on the same conduct. *United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994). The *Haines* court permitted two enhancements for

one underlying offense, but one enhancement was based on victim vulnerability and the other enhancement was based on the offender's conduct, in abusing a position of trust. *Id.*

Moreover, reading RCW 9.94A.310(3) and (4) to impose one enhancement based on the presence of a deadly weapon or a firearm comports with the stated purpose of the Hard Time Act to "[d]istinguish between the gun predators and criminals carrying other deadly weapons." LAWS OF 1995, ch. 129, § 1(2)(c). Of equal importance, this "either/or" reading avoids the absurd situation where an offender would receive one firearm enhancement for carrying two guns, but two enhancements for carrying a pistol and a knife.

In sum, one enhancement was proper here based on the fact that the defendants were armed with a firearm during the kidnapping.

## · CONCLUSION

We conclude that the court erred in the sentencing of Mr. Diaz, Mr. Reyes, Enrigue DeSantiago, and Mr. Caranza by imposing two consecutive enhancements and we remand their cases for resentencing. In all other respects, we affirm the judgments of the trial court.

SWEENEY and KATO, JJ., concur.

Reconsideration denied October 30, 2001.